KIRCHNER, APPELLANT, *v.* CRYSTAL, APPELLEE.

[Cite as Kirchner *v.* Crystal (1984), 15 Ohio St. 3d 326.]

(No. 83-1769—Decided December 31, 1984.)

*Shane, Caravona, Behrens & Summers Co., L.P.A., Mr. Michael Shane* and *Mr. Richard M. Summers,* for appellant.

*Messrs. Gallagher, Sharp, Fulton & Norman, Mr. Robert C. Horrigan* and *Mr. Thomas J. Kaiser,* for appellee.

SWEENEY, J. Once again, this court is called upon to reexamine its position with respect to the doctrine of parental immunity in the state of

Ohio. Until today, the doctrine of parental immunity has stood as an impervious obstacle for almost all children who have attempted to institute legal proceedings against their parents, in order to recover damages for injuries sustained as a result of the parent's tortious actions. While appellant herein contends that an exception should be carved out of the general immunity framework with respect to stepparents or persons who stand *in loco parentis,* we find that creating such an exception would inevitably produce another meaningless distinction without any real differences. In this vein, we accept appellee's contention that the policy considerations between a natural child and parent are no different in actions between stepchildren and stepparents who stand *in loco parentis.* Therefore, in the interests of justice and fairness, and for the reasons that follow, we hold that the doctrine of parental immunity is hereby abolished without reservation. In so doing, we expressly overrule our prior pronouncements on this matter as contained in *Teramano* v. *Teramano* (1966), 6 Ohio St. 2d 117 [35 O.O.2d 144], and *Mauk* v. *Mauk* (1984), 12 Ohio St. 3d 156.

Unlike the doctrine of interspousal immunity which is firmly rooted in common law, the doctrine of parental immunity is completely devoid of any common-law origins. See, generally, Prosser, Law of Torts (4 Ed. 1971) 859 *et seq.,* Section 122. It has been oft-stated that the genesis of the judicially created doctrine of parental immunity occurred in the case of *Hewlett* v. *George* (1891), 68 Miss. 703, 9 So. 885. The doctrine then spread throughout the country to the point that one jurisdiction felt it was compelled to opine that family harmony would be set back if it allowed a fifteen year old daughter to maintain a civil action for damages against her father for rape. *Roller* v. *Roller* (1905), 37 Wash. 242, 79 P. 788.

Our research concerning parental immunity reveals that the doctrine has been upheld on four basic justifications: first, the doctrine will preserve the domestic peace, harmony and tranquility of the family unit; second, the doctrine inhibits possible interference with parental discipline and control; third, the doctrine hinders the potential depletion of the family funds or exchequer; and fourth, the doctrine prevents the possibility of fraud and collusion.[1]

We find these rationalizations underlying the doctrine of parental immunity to be outdated, highly questionable and unpersuasive. To state that the allowance of actions between parents and children will somehow undermine the familial peace and tranquility is to ignore the evolution of exceptions which have eroded the doctrine into a somewhat limited application of immunity.

The initial acknowledgement of the parental immunity doctrine in Ohio also provided the first indication of the erosion of the doctrine in the

---

[1] See *Karam* v. *Allstate Ins. Co.* (1982), 70 Ohio St. 2d 227, 228-229 [24 O.O.3d 327]; and *Dorsey* v. *State Farm Mut. Ins. Co.* (1984), 9 Ohio St. 3d 27, 28.

case of *Signs* v. *Signs* (1952), 156 Ohio St. 566 [46 O.O. 471]. In *Signs*, this court unanimously held that a parent, while acting in his or her business or vocational capacity, was not immune from a tort action brought by his or her minor unemancipated child. While the *Signs* opinion was limited in its retreat from an all-pervasive immunity scheme, it provides us with an excellent criticism of the folly of the domestic tranquility rationale:

"It seems absurd to say that it is legal and proper for an unemancipated child to bring an action against his parent concerning the child's property rights yet to be utterly without redress with reference to injury to his person.

"It is difficult to understand by what legerdemain of reason, logic or law such a situation can exist or how it can be said that domestic harmony would be undisturbed in one case and be upset in the other." *Id.* at 576.

Other courts have analyzed the domestic tranquility rationale for the parental immunity doctrine, and have similarly rejected it as being unmeritorious. See, *e.g., Briere* v. *Briere* (1966), 107 N.H. 432, 224 A. 2d 588; *Gelbman* v. *Gelbman* (1969), 23 N.Y. 2d 434, 297 N.Y.Supp. 2d 529, 245 N.E. 2d 192; *Falco* v. *Pados* (1971), 444 Pa. 372, 282 A. 2d 351; *Plumley* v. *Klein* (1972), 388 Mich. 1, 199 N.W. 2d 169; *Rupert* v. *Stienne* (1974), 90 Nev. 397, 528 P. 2d 1013; *Elam* v. *Elam* (1980), 275 S.C. 132, 268 S.E. 2d 109. See, also, *Dorsey* v. *State Farm Mut. Auto. Ins. Co.* (1984), 9 Ohio St. 3d 27, 30 (William B. Brown, J., concurring); and *Mauk* v. *Mauk* (1984), 12 Ohio St. 3d 156, 160 (Clifford F. Brown, J., dissenting).

If any disruption to family harmony or tranquility occurs, it is more likely to happen as a result of tortious conduct, rather than as a result of allowing redress of the wrongful actions which led to injury. Restoration of domestic tranquility in our opinion will be promoted by our abrogation of this artificial bar to recovery which is based wholly upon a familial relationship.

The second justification used to support the parental immunity doctrine, *i.e.,* that it inhibits possible interference with parental discipline and control, is also lacking in merit. In rejecting this argument, we are persuaded by the cogent analysis implemented by the California Supreme Court in *Gibson* v. *Gibson* (1971), 3 Cal. 3d 914, 92 Cal. Rptr. 288, 479 P. 2d 648, at 920-921:

"* * * the possibility that some cases may involve the exercise of parental authority does not justify continuation of a blanket rule of immunity. In many actions, no question of parental control will arise. Thus, the parent who negligently backs his automobile into his child or who carelessly maintains a lawnmower, which injures the child, cannot claim that his parental role will be threatened if the infant is permitted to sue for negligence. To preserve the rule of immunity in such cases, where the reason for it fails, appears indefensible."

Similarly, the California court correctly debunked the third ra-

tionalization for the parental immunity doctrine — that immunity prevents the draining of the family exchequer:

"* * * we feel that we cannot overlook the widespread prevalence of liability insurance and its practical effect on intra-family suits. Although it is obvious that insurance does not create liability where none otherwise exists * * * [citation omitted], it is unrealistic to ignore this factor in making an informed policy decision on whether to abolish parental negligence immunity. * * * [Citation omitted.] We can no longer consider child-parent actions on the outmoded assumption that parents may be required to pay damages to their children. As Professor James has observed: 'Recovery by the unemancipated minor child against his parent is almost uniformly denied for a variety of reasons which involve the integrity of the family unit and the family exchequer and the importance of parental discipline. But in truth, virtually no such suits are brought except where there is insurance. And where there is, none of the threats to the family exists at all.' (James, *Accident Liability Reconsidered: The Impact of Liability Insurance* [1948], 57 Yale L.J. 549, 553.)" *Id.* at 922.

The final rationale used to uphold the doctrine of parental immunity is that abrogation of the same will promote fraudulent or collusive lawsuits. This all too familiar justification was also used to support the Ohio Guest Statute (R.C. 4515.02), and was unanimously rejected by this court in *Primes* v. *Tyler* (1975), 43 Ohio St. 2d 195 [72 O.O.2d 112]. We see no compelling reason why such a justification should deny an innocent injured child his or her day in court merely because in some rare instances, fraud or collusion may take place. Unfortunately, fraud and collusion are always a possibility in any legal action that is pursued. In these types of situations, we depend on our judicial framework to ferret out the fictitious claims from the real ones. Our system is well equipped with sufficient safeguards which are designed to thwart the opportunity for fraud and collusion. The deterrent effect of a perjury charge, extensive and detailed pretrial discovery procedures, the opportunity for cross-examination, and the availability of summary judgment motions are but a few examples of the tools available to our judicial system in exposing fraudulent claims in any type of lawsuit. To deny an injured party a redressable claim for injuries sustained simply because fraud and collusion may occur in the exceptional case, is in our view, manifestly unjust.

In reviewing the sum and substance of all the traditional justifications posited in favor of the parental immunity doctrine, we call attention to the fact that none of these rationalizations was deemed strong enough to overcome the judicial ability to engraft certain exceptions to the otherwise blanket immunity rule. In *Signs, supra,* parental immunity was eliminated in the context where a child sustained injury as a result of the parent engaging in his or her vocational or business capacity. *Dorsey, supra,* abrogated parental immunity where a negligence action was brought by a minor child against the estate of the child's deceased parent. *Teramano,*

*supra,* acknowledged that immunity should not bar an action where the conduct of the parent indicates "a malicious intention to injure." *Id.* at 119.[2]

We find that the best course to follow is to abrogate parental immunity *in toto.* Resort to the temptation of carving out an exception to the immunity doctrine will only serve to perpetuate the fallacious arguments which have supposedly supported the doctrine. Abolition of parental immunity as a matter of public policy will provide the innocent victims of tortious conduct the forum they deserve in attempting to redress their claims. The widespread availability of liability insurance from a variety of sources operates to eradicate any perceived problems which the absence of immunity may have presented.

By eliminating the anachronistic doctrine of parental immunity in Ohio, we join the modern trend of legal thought established by those courageous jurisdictions which have abolished the doctrine in its entirety. See *Petersen* v. *Honolulu* (1969), 51 Hawaii 484, 462 P. 2d 1007; *Briere, supra; Gelbman, supra; Falco, supra; Rupert, supra;* and *Elam, supra.*[3]

As Dean Prosser noted, the decision to abrogate parent-child immunity in *Goller* v. *White* (1963), 20 Wis. 402, 122 N.W. 2d 193, "set off something of a long-overdue landslide." Prosser, *supra,* at 867. We believe the time has arrived for Ohio to join that "long-overdue landslide."

Given the posture we have embraced with respect to the elimination of parental immunity, we must in the interests of logic and consistency also abrogate the "child immunity corollary" to the parental immunity doctrine established in *Mauk* v. *Mauk, supra.*

Therefore, based upon all of the foregoing, we reverse the judgment of the court of appeals and remand the cause to the trial court for further proceedings consistent with this opinion.

*Judgment reversed and*
*cause remanded.*

W. Brown, C. Brown and J. P. Celebrezze, JJ., concur.

C. Brown, J., concurs separately.

Celebrezze, C.J., Locher and Holmes, JJ., dissent.

---

[2] Parental immunity is also non-existent in actions such as the setting aside of real estate conveyances and the right to sue for compensation for services. See 41 Ohio Jurisprudence 2d (1960) 380, 381, Sections 60 and 62. See, also, *Sumwalt* v. *Allstate Ins. Co.* (1984), 12 Ohio St. 3d 294.

[3] For an exhaustive categorization of the positions of all jurisdictions with respect to the parental immunity doctrine, see Annotation (1981), 6 A.L.R. 4th 1066. See, also, *Karam* v. *Allstate Ins. Co., supra,* fn. 4, at 230-231; and *Mauk* v. *Mauk, supra,* fns. 1-4, at 157-158.

CLIFFORD F. BROWN, J., concurring. Death in Ohio of the parental immunity rule by our holding today is long overdue, for the exhaustive, well-founded reasons expressed in Justice Sweeney's excellent opinion. Why intelligent Justices of this court had to wait this long to discern the justice in eliminating parental and child immunity is inexplicable. The parental and child immunity doctrines could and should have been eliminated by our court in 1982 in *Karam* v. *Allstate Ins. Co.* (1982), 70 Ohio St. 2d 227 [24 O.O.3d 327], for the detailed reasons set forth in my dissent in *Karam,* at 235-239. *Karam* recognized immunity of the defendant parent in a suit by an unemancipated child in a negligence action against the administrator of the estate of the child's mother. Thus for two more years until our decision today some parents and children were denied due process of law and equal justice. This was an unnecessary judicial extravagance.

Although our holding today overrules the immunity of a minor child in a negligence suit by his parent, *Mauk* v. *Mauk* (1984), 12 Ohio St. 3d 156, and overrules the immunity of a parent in a negligence suit by his minor child, *Teramano* v. *Teramano* (1966), 6 Ohio St. 2d 117 [35 O.O.2d 144], it should be noted that *Karam* v. *Allstate Ins. Co., supra,* is a judicially dead dodo just as it should be. *Karam* in its syllabus followed *Teramano, supra.* We have overruled *Teramano* today, thus destroying the underpinning for *Karam.* Also in *Dorsey* v. *State Farm Mut. Auto. Ins. Co.* (1984), 9 Ohio St. 3d 27, in the syllabus, we expressly overruled *Karam.* However, the body of the opinion in *Dorsey* appeared not to overrule *Karam* without reservations or limitations. See Justice William B. Brown's dissent, at 30, in *Dorsey.* Our decision today is intended to overrule *Karam* without any reservations or limitations, as perspicaciously urged by Justice Brown in *Dorsey, supra.*

Now, it is long overdue for this court when the issue arises in a future case, in continuing its enlightened path of equal justice in the quiet revolution of the law, to overrule for similar reasons the interspousal immunity rule last sanctified and glorified by this court in *Bonkowsky* v. *Bonkowsky* (1982), 69 Ohio St. 2d 152 [23 O.O.3d 188], and in *Varholla* v. *Varholla* (1978), 56 Ohio St. 2d 269 [10 O.O.3d 403]. (See dissent by Justice William B. Brown, at 271-275.) We should join the mainstream of excellent judicial thinking in most jurisdictions in the United States.

CELEBREZZE, C.J., dissenting. In *Dorsey* v. *State Farm Mut. Auto. Ins. Co.* (1984), 9 Ohio St. 3d 27, a majority of this court, as it is presently constituted, agreed that the doctrine of parental immunity was based on the valid public policy objectives of: preserving family harmony and tranquility, maintaining parental discipline, and avoiding risks of fraud and collusion. These sentiments were echoed in *Mauk* v. *Mauk* (1984), 12 Ohio St. 3d 156, 159, merely seven months later. Now, a majority of this *same* court, only five months after our decision in *Mauk, supra,* feels that paren-

tal immunity should be abolished "without reservation." In the time since *Mauk*, I have neither been persuaded that my earlier position in *Dorsey* and endorsed in *Mauk* is incorrect, nor have I perceived the type of societal revolution that would convince me that the policy objectives behind parental immunity have become obsolete. For these reasons, I will continue to adhere to my position that the doctrine of parental immunity should be retained.

Applying the doctrine to the facts of the case *sub judice* compels, in my view, affirming the judgment of the court of appeals. The general rule appears to be that a stepparent who undertakes and discharges fundamental parental obligations is entitled to parental immunity. See *Wooden* v. *Hale* (Okla. 1967), 426 P. 2d 679; *Workman* v. *Workman* (Okla. 1972), 498 P. 2d 1384; *Gunn* v. *Rollings* (1967), 250 S.C. 302, 157 S.E. 2d 590; *Thomas* v. *Inmon* (1980), 268 Ark. 221, 594 S.W. 2d 853; *Lyles* v. *Jackson* (1976), 216 Va. 797, 223 S.E. 2d 873. The rationale for extending parental immunity to a stepparent is simply that the justifications for parental immunity hold true to a stepparent standing *in loco parentis* to a minor. As it was stated in *London Guarantee & Accident Co., Ltd.* v. *Smith* (1954), 242 Minn. 211, 64 N.W. 2d 781, at 216-217:

"Clearly, the interests of society require peace and discipline in a home presided over by a faithful and devoted stepparent as well as in a natural home. * * * It does indeed seem contrary to public policy to discourage a stepfather from voluntarily assuming the unselfish, *in loco parentis* position to a child in need of parental care."

Here, the record clearly establishes that a parental relationship existed between appellant and appellee. Despite the fact that appellant's natural father has satisfied his support obligations imposed by law and visits appellee on a regular basis, appellant: has resided in appellee's household since 1971, when appellant was six years old; took appellee's last name when he began school and has since legally changed his name to Douglas Crystal; refers to appellee as "dad"; and is a named beneficiary on appellee's health insurance policy.

Accordingly, since I would affirm the judgment of the court of appeals, the same decision as that elusive majority of but a summer ago, I dissent.

HOLMES, J., concurs in the foregoing dissenting opinion.


LOCHER, J., dissenting. For the reasons expressed in my concurring opinions in *Bonkowsky* v. *Bonkowsky* (1982), 69 Ohio St. 2d 152, 154 [23 O.O.3d 188], and *Mauk* v. *Mauk* (1984), 12 Ohio St. 3d 156, 159, as well as those stated by Chief Justice Celebrezze in the instant case, I must dissent. The abrogation of familial immunity will do irreparable harm to one of the fundamental institutions of our society: the family unit. The rationales supporting this immunity remain viable today.