SHEARER ET AL., APPELLANTS, *v.* SHEARER, APPELLEE.

[Cite as Shearer *v.* Shearer (1985), 18 Ohio St. 3d 94.]

(No. 84-248—Decided July 3, 1985.)

*Stewart & DeChant Co., L.P.A.,* and *Scott E. Stewart,* for appellants.
*Meyers, Hentemann, Schneider & Rea Co., L.P.A.,* and *Henry A. Hentemann,* for appellee.

GREY, J. This case requires us to evaluate the entire concept of intrafamilial immunity since it involves both a husband and wife suit and a parent and child suit.

Oversimply, the reasons advanced in favor of intrafamilial immunity are based on two considerations. The first is a public policy argument that the courts should not interfere with the basic social unit, the family, nor promote any rule which interferes with the harmonious conduct of the family's affairs. The second is economic, *i.e.,* that intrafamilial suits will lead to a drain on the family finances, or fraud and collusion, or perhaps make liability insurance prohibitively expensive.

Our opinion therefore will treat the two issues of intrafamilial immunity in terms of these considerations. We will examine the public policy ramifications of parental immunity, proceed to a separate public policy ex-

amination of interspousal immunity, and then consider both in terms of liability insurance coverage which is inextricably involved with both questions.

## PARENTAL IMMUNITY

This court rejected *in toto* the doctrine of parental immunity in *Kirchner* v. *Crystal* (1984), 15 Ohio St. 3d 326. We follow the holding in *Kirchner* v. *Crystal, supra.*

While the principle of *stare decisis* is necessary to an orderly and predictable system of law, the principle is not to be substituted for analyzing each case as it is presented. To follow a precedent is not to reach the same result; rather, it is to adopt the reasoning of the precedential case. To reject a precedent is not merely to reach a different result, but to find that the reasoning and principles advanced in favor of that precedent are no longer persuasive.

Thus to follow *Kirchner,* although only a recent case, requires us to consider the doctrine of parental immunity as thoroughly as was done in *Kirchner.* The *Kirchner* case used an historical analysis, *i.e.,* a consideration of the history of the doctrine and the traditional arguments offered to support it.

Our analysis will be more empirical than historical, although we must consider the history of the parental immunity doctrine. Parental immunity did not exist at common law, but was created in what one writer[1] calls "the great trilogy." In these cases, the doctrine was stated as a maxim, and the reasons advanced were an *a priori* analysis. *A priori* reasoning is deducing consequences from a principle regarded as self-evident. For example, in *Roller* v. *Roller* (1905), 37 Wash. 242, 79 P. 788, it was said that suits between parent and child will lead to family disharmony.[2]

But *a priori* reasoning has not always been useful in legal analysis. As Justice Oliver Wendell Holmes said, "[t]he life of the law has not been logic: it has been experience." Holmes, The Common Law (1881) 1. If the doctrine of parental immunity as posited were a good and useful rule of law, we could reasonably presume that the experience of the law would empirically establish the wisdom of that doctrine.

That has not happened. On the contrary, many states that did adopt it have now rejected it. Wisconsin abrogated parental immunity in 1963 in *Goller* v. *White* (1963), 20 Wis. 402, 122 N.W. 2d 193, the first of many states to do so over the ensuing twenty years. New York abrogated the doctrine in 1969. *Gelbman* v. *Gelbman* (1969), 23 N.Y. 2d 434, 297 N.Y. Supp. 2d 529, 245 N.E. 2d 192. Pennsylvania has had no parental immunity since 1971. *Falco* v. *Pados* (1971), 444 Pa. 372, 282 A. 2d 351.

If the elimination of parental immunity were a bad legal position, one would reasonably expect to find that those states were experiencing prob-

---

[1] McCurdy, Torts Between Parent and Child (1960), 5 Vill. L. Rev. 521.

[2] This was said in a case where a daughter was suing her father for rape.

lems with the abrogation. A review of the literature finds no law review articles entitled "Disintegration of the Family in Wisconsin" or "Family Problems in New York Resulting from Abrogation of Parental Immunity." Whatever might have been predicated as the result of abrogating parental immunity, experience has not borne out those predictions.

According to Associate Professor Gail Hollister in Parent-Child Immunity: A Doctrine in Search of Justification (1982), Fordham L. Rev. 489, at 494, footnote 39, seven states have never adopted parental immunity — Alaska, Hawaii, Kansas, North Dakota, South Dakota, Utah and Vermont. If the public policy reasons given for parental immunity are so compelling, one would presume these seven states would have suffered for failure to adopt the rule. Again there is no evidence or persuasive material that any of these states ever suffered adverse consequences for the lack of such a rule.

There is no question that courts should avoid rules which can interrupt family harmony or usurp parental authority. When the parental immunity doctrine was created, it asked the question: Might not these kinds of suits cause problems for families? *A priori,* they might. But empirically, they have not.

It might have appeared judicious to prohibit child-parent lawsuits on public policy grounds. To continue to deny access to the courts on the grounds of "what may be," in the face of overwhelming experience to the contrary in the many other states, is nothing more than a denial of due process.

In Ohio, our Constitution requires in Section 16, Article I that:

"All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay."

This kind of analysis was used in *Hawkins* v. *United States* (1958), 358 U.S. 74, at 81-82, wherein it was stated in rejecting the hoary legal concept of husband-wife testimonial privilege:

"* * * When such a rule is the product of a conceptualism long ago discarded, is universally criticized by scholars, and has been qualified or abandoned in many jurisdictions, it should receive the most careful scrutiny. Surely 'reason and experience' requires that we do more than indulge in mere assumptions, as to the importance of this ancient rule to the interests of domestic tranquillity."

We thus reaffirm our holding in *Kirchner* v. *Crystal, supra.*

## INTERSPOUSAL IMMUNITY

The doctrine of interspousal immunity has its roots in the common law, growing out of the concept that upon marriage the husband and wife ceased having independent identities and became one.

In 1874, the Ohio Legislature provided married women with the right to sue and be sued to the same extent as if unmarried. 71 Ohio Laws 47, Section 28. This statutory provision, however, was not interpreted to allow interspousal negligence suits, although similar statutes in other states were interpreted to grant this right. See, *e.g., Hosko* v. *Hosko* (1971), 385 Mich. 39, 187 N.W. 2d 236; *Schneider* v. *Schneider* (1969), 110 N.H. 70, 260 A. 2d 97; *Stewart* v. *Harris* (Okla. 1967), 434 P. 2d 902; *Coffindaffer* v. *Coffindaffer* (W. Va. 1978), 244 S.E. 2d 338.

In *Leonardi* v. *Leonardi* (1925), 21 Ohio App. 110, the court held that the legislature had not intended the "right to sue" statute to grant the wife the right to sue her husband without granting him the corollary right to sue her. The court sustained the dismissal of her suit on grounds that:

"To give either the husband or wife the right to sue the other for injury sustained by reason of a negligent act would strike at the very heart of the peaceable domestic relation of the husband and wife, and, further, at the happiness of the family." *Id.* at 116-117.

In 1952, this court decided *Damm* v. *Elyria Lodge No. 465* (1952), 158 Ohio St. 107 [48 O.O. 54], and rejected the unity of marriage concept. It held, at 121:

"In Ohio, the Constitution and the pertinent statutes have the effect of so modifying the common-law rule as to authorize the maintenance of the action by the plaintiff against her husband and consequently against the defendants."

But the court reverted to the old common-law immunity standard in 1965, when, in *Lyons* v. *Lyons* (1965), 2 Ohio St. 2d 243 [31 O.O.2d 504], it restricted the *Damm* holding to the facts of that case, a slip-and-fall suit against an unincorporated association of which the spouse was a member. The *Lyons* decision set forth three rationales for disallowing interspousal negligence suits: the preservation of marital harmony, the prevention of fraud and collusion, and the theory that changes in public policy should emanate from the legislature.

The *Lyons* holding, and these rationales, were followed and reinforced in *Varholla* v. *Varholla* (1978), 56 Ohio St. 2d 269 [10 O.O.3d 403], and *Bonkowsky* v. *Bonkowsky* (1982), 69 Ohio St. 2d 152 [23 O.O.3d 188], where the court denied relief to wives injured by the allegedly negligent driving of their spouses.

The first of the three rationales cited in *Lyons, supra,* is based on a distinction between personal injury actions and other tort, contract, and property actions between husband and wife. The state of Ohio has had no difficulty in allowing a wife to sue her husband for intentionally inflicted injury. *Kobe* v. *Kobe* (1978), 61 Ohio App. 2d 67 [15 O.O.3d 86]. Litigation over property, contracts and criminal activity is not barred, despite the fact that each of these is ripe with the possibility of affecting marital harmony. Only personal injury actions are barred by the doctrine. As pointed

out by the Restatement of the Law 2d, Torts (1965) 425, Section 895F, Comment *d*:

"* * * This was apparently upon the premise that an uncompensated tort makes for peace in the family and that if the wife is sufficiently injured and incensed to want to sue her husband she will be soothed and mollified by denying her the remedy — and all this even though no disruption of domestic tranquillity will result if she sues him for a tort against her property or brings a criminal prosecution."

In Ohio, this court has taken this artificial distinction between negligent personal injury torts and other actions to an extreme. In *Prem* v. *Cox* (1983), 2 Ohio St. 3d 149, this court held although a negligent husband could not be held legally responsible for his wife's suffering and pain during her lifetime, her estate could sue him for her wrongful death. In effect, he can collect the insurance benefits for his own negligence through his wife's estate, while she cannot collect compensation for a life of pain. This is hardly supportive of marital harmony.

We conclude that the preservation of marital harmony is better served by allowing the negligent spouse, who in this day and age has more likely than not purchased liability insurance to compensate those whom he injures, to provide for his injured spouse, than by denying compensation for the spouse's suffering because of fear for the harmony of the marital unit.

Similarly, the prevention of fraudulent and collusive suits does not require that we deny legitimate claims. A husband and wife who have suffered an unfortunate accident are no more likely to collaborate to defraud an insurance company than a host, anxious to provide for the compensation of a guest injured in the same way. As this court stated in *Primes* v. *Tyler* (1975), 43 Ohio St. 2d 195, 201 [72 O.O.2d 112], in overruling the artificial immunity provisions of the Guest Statute:

"* * * In all other cases, we rely upon the standard remedies of perjury, the efficacy of cross-examination, the availability of pretrial discovery, and the good sense of juries to detect false testimony if it should occur. We do not withdraw the remedy from all injured persons in order to avoid a rare recovery based upon false testimony."

The husband and wife have no greater ability to commit fraud than the survivor in *Prem* v. *Cox, supra,* who stands to benefit directly from the proof of his own negligence, without need for convincing another party to join in the plot.

Neither an increase in marital disharmony nor a flood of fraudulent claims has been noted in those states with a long history of abrogating interspousal tort immunity. In *Courtney* v. *Courtney* (1938), 184 Okla. 395, 87 P. 2d 660, Oklahoma became the tenth state to announce the abrogation of interspousal immunity. In 1967, *Courtney* v. *Courtney* was still the leading case, unchallenged through twenty-nine years. *Stewart* v. *Harris, supra.* Despite the fact that about one-third of the states continue to apply

the doctrine of interspousal immunity, no state that has once abrogated it has ever reinstituted the doctrine.

The Restatement of the Law 2d, Torts, *supra,* states at 425, Section 895F, Comment *f*:

"Abrogation. The last two decades have witnessed the definite rejection and abolition of the immunity between husband and wife in its entirety in a substantial number of jurisdictions. Numerous courts have followed a dissenting opinion of Mr. Justice Harlan in *Thompson* v. *Thompson,* (1910) 218 U.S. 611, and have held that the Married Women's Acts and the position of equality in which they were intended to place the spouses have removed all reason and justification for the immunity, and that one spouse is subject to liability to the other for any tort whether it is to property or to the person. The number of these decisions has been on the increase in recent years and has been encouraged by the spread and general use of liability insurance, particularly in automobile cases. *The indications are clear that this is the future state of the law in all states."* (Emphasis added.)

But if interspousal immunity is on the way out, who should eliminate it?

The final rationale, that only the legislature should undertake this change in social policy, is belied by the history of the policy itself. Interspousal immunity is a doctrine of the common law, a creation of the courts, not of the legislature. The common law is dynamic, and adapts to the changing circumstances of society. When feudal concepts of a marital entity evolve to the modern concept of the marital partnership, it is the court's duty to see that the law reflects the changing face of society.

This court should be as responsive to the needs of modern society as the medieval courts which created the doctrine were to the needs of feudal society. The doctrine of interspousal immunity served the needs of feudal society dedicated to the concentration of wealth and power in the hands of a few. Just as other courts have eliminated other vestiges of feudal life like primogeniture and restrictions on alienation, this court should eliminate this final anachronism.

## INSURANCE

Having considered the public policy arguments on parental and interspousal immunity, we now turn to the issues of fraud and collusion, *i.e.,* the issue of liability insurance.

Insurance is inextricably involved with the issue of intrafamilial immunity, because as noted by most of the writers on this issue, unless there is liability insurance intrafamilial lawsuits do not occur. In *Gibson* v. *Gibson* (1971), 3 Cal. 3d 914, 92 Cal. Rptr. 288, 479 P. 2d 648, the California case which abrogated parental immunity, "* * * it is unrealistic to ignore this factor (insurance) in making an informed policy decision on whether to abolish parental negligence immunity." *Id.* at 922.

100

Some states have taken the position that intrafamilial immunity does not apply except where there is automobile liability insurance. For example, in *Ard* v. *Ard* (Fla. 1982), 414 So. 2d 1066, the Florida Supreme Court held, at 1067:

"While we reaffirm our adherence to parental/family immunity, we hold that, in a tort action for negligence arising from an accident and brought by an unemancipated minor child against a parent, the doctrine of parental immunity is waived to the extent of the parent's available liability insurance coverage. If the parent is without liability insurance, or if the policy contains an exclusion clause for household or family members, then parental immunity is not waived and the child cannot sue the parent."

Other states, abrogating intrafamilial immunity in motor vehicle negligence cases, have justified their decisions by pointing out the almost universal existence of liability coverage. *E.g., Lee* v. *Comer* (W. Va. 1976), 224 S.E. 2d 721; *Nocktonick* v. *Nocktonick* (1980), 227 Kan. 758, 611 P. 2d 135; *Hebel* v. *Hebel* (Alaska 1967), 435 P. 2d 8.

Those states that never had parental immunity, and those that have eliminated both parental and interspousal immunity, have not had any apparent difficulty with fraud and collusion against insurance companies. Although it was claimed that elimination of intrafamilial immunity would lead to these suits, the experience seems to be much like Ohio's experience with the Guest Statute. In spite of the dire predictions over *Primes* v. *Tyler, supra,* the great flood of fraudulent collusive lawsuits did not occur.

Many reasons might be advanced on why the threatened flood of collusive lawsuits has never emerged, but the most likely reason is the market. The issue of collusion ought not to be a legal issue at all because the forces of the market will eliminate the problem. All insurance policies are issued with the idea that the return on the premium and investments will exceed the anticipated losses. Where there is a risk that fraud or collusion could lead to losses which far exceed the income generated by the policy, an insurance company has only limited choices. It can refuse to write such policies; it can take precautions to eliminate the potential for fraud[3]; or it can charge a premium so prohibitively expensive that the coverage is unmarketable.

Companies fearing such suits will not write such policies, or perhaps, as is much more common, will include a household member exclusion clause. See, *e.g., Schwalbe* v. *Jones* (1976), 16 Cal. 3d 514, 128 Cal. Rptr. 321, 546 P. 2d 1033, where at 521, fn. 9, it was judicially noticed that all automobile policies sold in California carry such an exclusion. It even seems likely that without such exclusions, liability policies are marketable. Minnesota abolished intrafamilial immunity in *Beaudette* v. *Frana* (1969),

---

[3] See, *e.g.,* Buchner & Oliver, Foiling the Fine Art of Fraud, Best's Review, Property/Casualty Insurance Ed., April 1985, at 56, where the authors discuss insuring fine art objects whose value is highly subjective.

285 Minn. 366, 173 N.W. 2d 416 (spousal), *Balts* v. *Balts* (1966), 273 Minn. 419, 142 N.W. 2d 66, and *Silesky* v. *Kelman* (1968), 281 Minn. 431, 161 N.W. 2d 631 (parental), and in 1969 its legislature barred family exclusion clauses in automobile liability policies. 1969 Minn. Laws 738. Although Minnesota became a no-fault state in 1974, for five years non-exclusionary policies were sold in Minnesota.

Perhaps we should rethink our position on the entire issue of liability insurance, and look at the practical economic issue of marketability and not the legal issue of fraud. No company will issue a policy which will lead to collusive fraudulent losses, but if there is a willing seller of insurance coverage, and a willing buyer of a policy, there should be few, if any, restrictions on the sale of that policy.

Indemnification is one purpose of liability insurance, but as was said in *Balts, supra,* at 430:

"Some jurisdictions have noted that liability insurance is designed not merely to indemnify the defendant but to protect those who are injured, more particularly if they are members of defendant's immediate family."

Ohio, in R.C Chapter 4509, mandates automobile liability insurance, requiring a driver to insure against damage he might do to any person. But to his family, to the persons nearest to him whom he would most like to see compensated for their injuries, he must remain a noninsured motorist. Where intrafamilial suits are barred, no company can issue such a policy and no insured can buy such coverage, even though there may well be a willing seller and willing buyer.

Perhaps such coverage should be sold; perhaps it should not. That is not for this court to decide; it is for the marketplace, and for the buyers and sellers of insurance to decide. What this court should not do is put artificial and outmoded restrictions on the market in that type of coverage. Nonetheless, that is exactly what intrafamilial immunity does. By abrogating both parental and interspousal immunity, we are putting an end to the overweening judicial interference with the forces of our free market economy.

## CONCLUSION

Turning now to the facts in this case, we note that the facts are somewhat unique. The birth and the marriage both followed the tort. We could carve out yet another exception by saying that where the marriage follows the tort such actions are not barred. But, such an exception would be unreasonable inasmuch as it seems anomalous to allow access to the courts by people who are living in a meretricious relationship, and then bar them from court where they enter holy matrimony. To create another exception would only be an attempt to keep alive the doctrine of interspousal immunity, a legal tenet that has outlived its usefulness.

Based on the foregoing, the judgment of the court of appeals is reversed and the cause is remanded to the trial court for further proceedings.

*Judgment reversed
and cause remanded.*

Sweeney, C. Brown and Douglas, JJ., concur.

C. Brown, J., concurs separately.

Celebrezze, C.J., Locher and Holmes, JJ., separately dissent.

Grey, J., of the Fourth Appellate District, sitting for Wright, J.

Clifford F. Brown, J., concurring. Although within a period of six months we have twice declared parental immunity dead, namely, in *Kirchner* v. *Crystal* (1984), 15 Ohio St. 3d 326, and in the *Shearer* case here, there are still strident judicial voices striving to resurrect and to rekindle the burned-out judicial ashes of the parental immunity doctrine. Hopefully for the good of all citizens such stridency is only a misdirected, unsuccessful expenditure of judicial energy to turn the judicial clock back to the nineteenth century or earlier.

As I stated before, and I state it again, it is inexplicable how intelligent justices of this court could wait so long to discern the justice in eliminating the parental and child immunity doctrine. *Kirchner, supra,* concurring opinion of Clifford F. Brown, J., at 331.

In my dissent in *Karam* v. *Allstate Ins. Co.* (1982), 70 Ohio St. 2d 227, 235 [24 O.O.3d 327], I explained the flimsy rationalization and irrelevant nonsense concerning prevention of fraud and collusion and preserving domestic harmony asserted by judges to give continuing life to the interspousal immunity doctrine in *Bonkowsky* v. *Bonkowsky* (1982), 69 Ohio St. 2d 152 [23 O.O.3d 188], and that this was reason enough to eliminate spousal immunity.

Urgency for death of the parental immunity rule was equally compelling for the same reasons. The parental immunity rule existed to pull the chestnuts out of the fire for liability insurance companies by reducing in a very small measure liability insurance benefits payable, thereby very slightly reducing liability insurance premiums for all policyholders. The rule therefore was devoid of a sense of justice. *Karam, supra,* at 236. Judicial partiality and prejudice must be the basis for the former parental immunity rule because it was created and existed only in a small category of cases, actions for negligence between parent and child, but not in any other area of litigation where liability insurance does not protect the defendant. This smacks of judicial hypocrisy at its zenith. The same criticism is applicable to the spousal immunity rule. As pointed out in the majority opinion of Judge Grey in this case concerning interspousal immunity there never has been any spousal immunity in actions for intentional injury, and in actions involving property, contracts and criminal ac-

tivity. To this listing could be added the lack of immunity in actions involving will contests, contesting interests and claims in family estates, divorces, torts excepting negligence, as well as in every other area of litigation. See dissents of Justice William B. Brown in *Varholla* v. *Varholla* (1978), 56 Ohio St. 2d 269, at 271-275 [10 O.O.3d 403], and in *Bonkowsky* v. *Bonkowsky* (1982), 69 Ohio St. 2d 152, at 156-162 [23 O.O.3d 188]. See, also, *Dorsey* v. *State Farm Mut. Auto. Ins. Co.* (1984), 9 Ohio St. 3d 27, concurring opinion of William B. Brown, J., at 30; *Mauk* v. *Mauk* (1984), 12 Ohio St. 3d 156, dissenting opinion of Clifford F. Brown, J., at 160-162.

CELEBREZZE, C.J., dissenting. I dissent for the reasons stated in my dissenting opinion in *Kirchner* v. *Crystal* (1984), 15 Ohio St. 3d 326, 331-332.

LOCHER, J., dissenting. I dissent for the reasons given in my concurring opinions in *Bonkowsky* v. *Bonkowsky* (1982), 69 Ohio St. 2d 152, 154-155 [23 O.O.3d 188]; *Mauk* v. *Mauk* (1984), 12 Ohio St. 3d 156, 159; and in my dissenting opinion in *Kirchner* v. *Crystal* (1984), 15 Ohio St. 3d 326, 332.

HOLMES, J., dissenting. I dissent for the reasons previously set forth in my concurrence to the dissenting opinion in *Kirchner* v. *Crystal* (1984), 15 Ohio St. 3d 326, 331-332; and my concurring opinion in *Mauk* v. *Mauk* (1984), 12 Ohio St. 3d 156, 160.