Mindy Elaine BROADWELL, by Next of Kin, Mark BROADWELL, and Justin L. Broadwell, by Next Friend, Mark Broadwell, Plaintiffs–Appellants,

v.

Susan M. HOLMES, Defendant–Appellee.

Supreme Court of Tennessee,
at Knoxville.

Feb. 7, 1994.

Don W. Poole, Poole, Lawrence, Thornbury, Stanley & Morgan, Chattanooga, for plaintiffs-appellants.

Gary A. Cooper, Cynthia D. Hall, Fleissner, Cooper & Marcus, Chattanooga, for defendant-appellee.

## OPINION

REID, Chief Justice.

This case presents for review the judgment of the Court of Appeals dismissing a

suit on behalf of two unemancipated minor children against their mother for personal injuries to one child and for the wrongful death of the other child. The children were injured while riding as passengers in an automobile operated by the mother. The trial court found that the complaint did not state a cause of action, and the Court of Appeals affirmed.

This Court granted permission to appeal in order to re-examine the parental immunity doctrine, first adopted in this state in *McKelvey v. McKelvey*, 111 Tenn. 388, 77 S.W. 664 (1903), and most recently reaffirmed in *Barranco v. Jackson*, 690 S.W.2d 221 (Tenn. 1985), a case in which the dissent advocated that parental immunity be abolished in "automobile tort" cases.

In the case before the Court, Mindy Elaine Broadwell, age 8, and Justin L. Broadwell, age 6, were passengers in a pickup truck driven by their mother, the defendant, when the vehicle was involved in an accident. The complaint alleges that the defendant negligently lost control of the vehicle and that her negligence proximately caused the death of Mindy and serious bodily injuries to Justin. The suit was brought on behalf of the children by their father as next friend. At the time of the accident, the parents were divorced, and the mother had custody of the children.

The majority in *Barranco* declined to discuss the substantive issue of whether the parental immunity doctrine should be modified, observing only that the doctrine "has continuing vitality and should be adhered to unless modified or changed by action of the General Assembly." *Id.* at 222. Therefore, the first matter for consideration is whether the court will persist in the view expressed by the majority in *Barranco,* that it has no role in the development of the law in this area.

The existence and importance of the judge-made common law as an integral part of this state's jurisprudence can hardly be denied or deprecated. It is as old as Anglo–Saxon law. Before tracing the origin of the laws of England, Blackstone identified the two components of that law.

> The municipal law of England, or the rule of civil conduct prescribed to the inhabitants of this kingdom, may with sufficient propriety be divided into two kinds: the *lex non scripta,* the unwritten, or common law; and the *lex scripta,* the written, or statute law.

1 William Blackstone, *Commentaries,* p. 53 (Lewis Ed.1900) (footnotes omitted). Blackstone then stated the means whereby the common law maintains its currency.

> But here a very natural, and very material, question arises: how are these customs or maxims to be known, and by whom is their validity to be determined? The answer is, by the judges in the several courts of justice. They are the depositaries of the laws; the living oracles, who must decide in all cases of doubt, and who are bound by an oath to decide according to the law of the land.

*Id.* at 58 (footnotes omitted). Chancellor Kent in his *Commentaries* stated:

> In its improved condition in England, and especially in its improved and varied condition in this country, under the benign influence of an expanded commerce, of enlightened justice, of republican principles, and of sound philosophy, the common law has become a code of matured ethics and enlarged civil wisdom, admirably adapted to promote and secure the freedom and happiness of social life. It has proved to be a system replete with vigorous and healthy principles, eminently conducive to the growth of civil liberty....

1 James Kent *Commentaries on American Law,* pp. 398–99 (12th ed. 1884).

The vitality and relevance of the common law was emphasized by this Court almost a century ago:

> It is universally conceded that the fundamental principles of the common law are unchangeable, yet the courts recognize the necessity of flexibility in the application of old rules to new cases, so as to enable them to adopt these rules "to the ever-varying conditions and emergencies of human society." Thus, in *Woodman v. Pitman,* 79 Me., 456, 10 Atl., 321, 1 Am.St. Rep., 342, it is said: "The inexhaustible and ever-changing complications in human

affairs are constantly presenting new questions and new conditions which the law must provide for as they arise, and the law has expansive and adaptive force enough to respond to the demands thus made of it, not by subverting, but by framing new combinations, and making new applications out of its already established principles; the result produced being 'only the new corn that cometh out of old fields.' "

This court, in *Jacob v. State*, 3 Hum. 493, announces the same general doctrine in these words: "The common law of the country will never be entirely stationary, but will be modified and extended by analogy, construction, and custom so as to embrace new relations springing up from time to time from an amelioration or change of society. The present common law of England is as dissimilar from that of Edward III as is the present state of society. And we apprehend that no one could be found to contend that hundreds of principles which have in modern times been examined, argued, and determined by the judges are not principles of the common law because not found in the books of that period. They are held to be great and immutable principles, which have slumbered in their depositories because the occasion which called for their exposition had not arisen. The common law, then, is not like a statute, fixed and immutable, but by positive enactment, except where a principle has been adjudged as the rule of action."

*Box v. Lanier*, 112 Tenn. 393, 407–409, 79 S.W. 1042, 1045 (1903).

■ This Court has a continuing duty to consider whether the common-law, as created and developed through case law, is obsolete. " '[W]e abdicate our own function, in a field peculiarly non-statutory, when we refuse to consider an old and court made rule.' " *Hanover v. Ruch*, 809 S.W.2d 893, 896 (Tenn.), *cert. denied*, —— U.S. ——, 112 S.Ct. 381, 116 L.Ed.2d 332 (1991) (quoting *Kilbourne v. Hanzelik*, 648 S.W.2d 932, 934 (Tenn.1983). While recognizing the precedential value of prior case law is required to maintain uniformity and consistency in the law, a "mindless obedience to this precept

can confound the search for truth and foster an attitude of contempt." *Davis v. Davis*, 657 S.W.2d 753, 758 (Tenn.1983); *see also Hanover v. Ruch*, 809 S.W.2d 893, 898 (Tenn. 1991).

As a live and breathing thing, the law changes when necessary to serve the needs of the people. When this basic purpose of the law is slighted or overlooked, then it loses a high degree of its majesty.

*Dupuis v. Hand*, 814 S.W.2d 340, 346 (Tenn. 1991).

Accordingly, the reconsideration of *Barranco* is entirely appropriate.

The dissent in *Barranco* reviewed the development of parental immunity beginning with the doctrine's initial adoption by the Mississippi Supreme Court in *Hewellette v. George*, 68 Miss. 703, 9 So. 885 (1891), and noted that the doctrine had been subjected to criticism and modification in recent decisions. The dissent concluded:

[T]he sole policy consideration which justifies its application [is] a parent's right to discipline and use discretion in the care and rearing of children.

*Barranco v. Jackson*, 690 S.W.2d at 230.

Since the decision in *Barranco*, the trend to modify the parental immunity doctrine has continued. *See, e.g., Cates v. Cates*, 156 Ill.2d 76, 189 Ill.Dec. 14, 619 N.E.2d 715 (1993) (parental immunity limited to conduct inherent to parent-child relationship); *Glaskox By and Through Denton v. Glaskox*, 614 So.2d 906 (Miss.1992); (abrogated doctrine as it applies to negligent operation of motor vehicle); *Hartman By and Through Hartman v. Hartman*, 821 S.W.2d 852 (Mo.1991) (abrogated doctrine in favor of reasonable parent standard); *Kirchner v. Crystal*, 15 Ohio St.3d 326, 474 N.E.2d 275 (1984) (parental immunity abolished entirely); *Jilani By and Through Jilani v. Jilani*, 767 S.W.2d 671 (Tex.1988) (parental immunity limited to instances of reasonable exercise of parental authority or exercise of parental discretion). Although state courts have continued to modify parental immunity, the decisions have established no uniform standard for imposing parental liability. However, the cases uni-

formly[1] exempt from liability, expressly or implicitly, conduct, whether acts or omissions, incident to the exercise of parental authority and supervision.

In the first case in which the parent-child immunity doctrine was modified, the Supreme Court of Wisconsin expressed the concern that total abrogation of the doctrine would unduly interfere with parental authority and discipline. *Goller v. White,* 20 Wis.2d 402, 122 N.W.2d 193 (1963). In an effort to prevent such interference, the court abrogated immunity in all cases except those involving the exercise of parental authority over the child and/or the exercise of ordinary parental discretion with respect to the provision of food, clothing, housing, medical and dental services and other care. *Id.* 122 N.W.2d at 198. This approach reflects a recognition that the parent-child relationship is unique and that traditional negligence concepts cannot be applied in situations where the relationship is involved.

Several courts have adopted the *Goller* approach with minor variations of the standard. In *Sandoval v. Sandoval,* 128 Ariz. 11, 14, 623 P.2d 800, 803 (1981), the court stated that the immunity applies only if "the parent breached a duty owed to a child within the family sphere" rather than to the world at large. In *Rigdon v. Rigdon,* 465 S.W.2d 921 (Ky.1971), the court further varied the *Goller* standard. Instead of listing specific activities as to which a parent is immune in the use of ordinary parental discretion, the court narrowed the applicability of the immunity to parental acts of ordinary discretion used "with respect to provisions for the care and necessities of the child." *Id.* at 923. The Supreme Court of Michigan adopted the *Goller* approach but varied it by substituting the term "reasonable" for "ordinary." *Plumley v. Klein,* 388 Mich. 1, 199 N.W.2d 169, 173 (1972). In *Cates v. Cates,* the Illinois Supreme Court modified the *Goller* approach by limiting immunity to "conduct inherent to the parent-child relationship." *Cates v. Cates,* 189 Ill.Dec. at 28, 619 N.E.2d at 729.

Other courts have created their own standards regarding the immunity applicable in parent-child tort actions. In *Gibson v. Gibson,* 3 Cal.3d 914, 92 Cal.Rptr. 288, 293, 479 P.2d 648, 653 (1971), the California Supreme Court held that the proper test of a parent's conduct is: "What would an ordinary, reasonable and prudent *parent* have done in similar circumstances?" One of the states originally following the *Goller* approach has rejected it in favor of the reasonable parent standard. In *Anderson v. Stream,* 295 N.W.2d 595 (Minn.1980), the Minnesota Supreme Court rejected the *Goller* approach it had adopted earlier in *Silesky v. Kelman,* 281 Minn. 431, 161 N.W.2d 631 (1968). In *Anderson,* the court reasoned that the *Goller* standard was not very helpful because it still required a case-by-case analysis to determine whether the conduct at issue was within one of the exemptions. The court also was concerned that the standard added "to the potential for arbitrary decision-making in the area." 295 N.W.2d at 598. The determinative consideration for the court's holding was "that the areas of parental authority and discretion, for which the *Silesky* exceptions were designed to provide safeguards, can be effectively protected by use of a 'reasonable parent standard'." *Id.*

Another approach to modifying the parental immunity doctrine was articulated by the New York Court of Appeals in *Holodook v. Spencer,* 36 N.Y.2d 35, 364 N.Y.S.2d 859, 324 N.E.2d 338 (1974), in which it was alleged that the minor child's mother had negligently supervised her child when, as a result of being left untended, the child wandered into the street where she was struck by a passing automobile. Though noting the parents' obligations to support, guide, protect, and supervise their children, the court held that negligent supervision was not a tort actionable by the child, reasoning that there are very few accidental injuries to children that could not have been prevented by more intense parental supervision. *Id.* 364 N.Y.S.2d at 865–67, at 342–43. That court stated that imposing a parental duty of "constant surveillance and instruction" would place an overwhelming burden on parents since it is virtually impossible to supervise a child 24 hours a day.

---

1. Only the Ohio Supreme Court in *Kirchner v. Crystal,* 15 Ohio St.3d 326, 474 N.E.2d 275 (1984) has gone so far as to announce the abrogation of parental immunity *"in toto."*

Nevertheless, the *Holodook* court went on to say that when there is a breach of a recognized duty ordinarily owed apart from the family relationship, the law will not withhold liability merely because the parties are parent and child. *Id.* at 870–71, 324 N.E.2d at 346. The *Holodook* court criticized the reasonable parent standard for its attempt to apply a uniform standard of parental conduct across the spectrum of different economic, educational, cultural, ethnic, and religious backgrounds. The court stated that to apply the reasonable parent standard "would be to circumscribe the wide range of discretion a parent ought to have in permitting his child to undertake responsibility and gain independence." *Id.* at 871, 324 N.E.2d at 346.

■ The exemption from liability recognized in these cases is not based on the absence of a duty of care. Obviously, parents owe a high duty of care to their children. However, the rights, responsibilities, and privileges of parents in relation to their children are so unique that the ordinary standards of care which regulate conduct between others are not applicable to conduct incident to the particular relationship of parent and child. That relationship includes responsibilities not owed by parents to any persons other than their children; these responsibilities are inseparable from the privileges that parents have in rearing their children which are not recognized in any other relationship.

> Each parent has unique and inimitable methods and attitudes on how children should be supervised. Likewise, each child requires individualized guidance depending on intuitive concerns which only a parent can understand.... Consequently, [a]llowing a cause of action for negligent supervision would enable others, ignorant of a case's peculiar familial distinctions and bereft of any standards, to second-guess a parent's management of family affairs....

*Paige v. Bing Construction Co.*, 61 Mich. App. 480, 233 N.W.2d 46, 49 (1975). Even though the courts routinely and successfully intervene in order to protect a child when the parent's conduct towards the child is criminal or where the child's physical or mental health is seriously endangered, the court system is not an appropriate or effective forum for resolving controversies between parent and child, when such controversies necessarily involve ethical, religious, moral, or cultural values. *See* Beal, *"Can I Sue Mommy?", An Analysis of a Woman's Tort Liability for Prenatal Injuries to her Child Born Alive,* 21 San Diego L.Rev. 325 (1984).

■ The parental right to govern the rearing of a child has been afforded protection under both the federal and state constitutions. This Court has stated, "Tennessee's historically strong protection of parental rights and the reasoning of federal constitutional cases convince us that parental rights constitute a fundamental liberty interest under Article I, Section 8 of the Tennessee Constitution." *Hawk v. Hawk,* 855 S.W.2d 573, 579 (Tenn.1973); *see also Davis v. Davis,* 842 S.W.2d 588, 601 (Tenn.1992) *cert. denied,* —— U.S. ——, 113 S.Ct. 1259, 122 L.Ed.2d 657 (1993); *Bellotti v. Baird,* 443 U.S. 622, 638, 99 S.Ct. 3035, 3045, 61 L.Ed.2d 797 (1979) (recognition of parents' right to be free of undue, adverse interference by state); *Quilloin v. Walcott,* 434 U.S. 246, 255, 98 S.Ct. 549, 554, 54 L.Ed.2d 511 (1978) (recognition that parent-child relationship is constitutionally protected); *Wisconsin v. Yoder,* 406 U.S. 205, 232, 92 S.Ct. 1526, 1541, 32 L.Ed.2d 15 (1972) (recognition of parents' primary role in child rearing as a "fundamental interest" and "an enduring American tradition"); *Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944) (recognition that the custody, care and nurture of the child "reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder"). The integrity of the family unit has found protection against arbitrary state interference in the Due Process Clause of the Fourteenth Amendment, *Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 639–40, 94 S.Ct. 791, 796–97, 39 L.Ed.2d 52 (1974); *Roe v. Wade,* 410 U.S. 113, 152–53, 93 S.Ct. 705, 726–27, 35 L.Ed.2d 147 (1973); *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923); the equal protection clause of the Fourteenth Amendment, *Skinner v. Oklahoma,* 316 U.S. 535, 541, 62

S.Ct. 1110, 1113, 86 L.Ed. 1655 (1942); and the Ninth Amendment. *Griswald v. Connecticut*, 381 U.S. 479, 496, 85 S.Ct. 1678, 1688, 14 L.Ed.2d 510 (1965) (Goldberg, J., concurring).

Courts have expressed a concern that without the imposition of parent-child immunity, juries would feel free to express their disapproval of what they consider to be unusual or inappropriate child rearing practices by awarding damages to children whose parents' conduct was only unconventional. *See, e.g., Pedigo v. Rowley*, 101 Idaho 201, 205, 610 P.2d 560, 564 (1980); *Holodook v. Spencer*, 364 N.Y.S.2d at 869–71, 324 N.E.2d at 345–46 (N.Y.1974). Courts also properly have found that parents whose "[p]hysical, mental or financial weakness [causes them] to provide what many a reasonable man would consider substandard maintenance, guidance, education and recreation for their children, and in many instances to provide a family home which is not reasonably safe as a place of abode," should not be liable to the child for these "unintended injuries." *Chaffin v. Chaffin*, 239 Or. 374, 397 P.2d 771, 774 (1964) (*en banc*), *overruled by Heino v. Harper*, 306 Or. 347, 759 P.2d 253 (1988) (abolishing interspousal immunity); *accord Cannon v. Cannon*, 287 N.Y. 425, 40 N.E.2d 236, 237–38 (1942), *overruled by Gelbman v. Gelbman*, 23 N.Y.2d 434, 297 N.Y.S.2d 529, 245 N.E.2d 192, 193 (1969) (abolishing bar to intrafamily lawsuits), *but see Holodook v. Spencer*, 364 N.Y.S.2d at 865, 324 N.E.2d at 342 (negligent failure to supervise child not recognized as a tort). Such imposition of liability could effectively curtail the exercise of constitutionally guaranteed parental discretion in matters of child rearing. Consequently, it reasonably can be argued that parental immunity that relates to the right and duty to rear children implements a constitutional right. *See Hawk v. Hawk*, 855 S.W.2d at 579 (recognizing a fundamental constitutional right of parents to care for their children without unwarranted state intervention).

■ However, the relationship between parents and their children is not exclusively that of parent-child. A parent's conduct that injures a child may be outside the scope of their relationship as parent-child, and a child may be injured by a parent's conduct that is not in the exercise of parental authority, supervision, care, or custody. Consequently, the scope of the exemption from liability should be limited or defined by the purpose for granting the immunity, and the definition of the duty alleged to have been breached will disclose whether there is immunity. *See Cates v. Cates*, 189 Ill.Dec. at 28, 619 N.E.2d at 729.

The Court's essential task is to craft an objective standard, recognized in the above cases, that defines the conduct that should be protected by a parental immunity. The principle is perhaps most precisely stated in *Cates v. Cates*. In *Cates*, as in the case before the Court, the plaintiff was injured while riding in an automobile operated by her parent. The court declined to limit the modification of parental immunity to automobile negligence cases, finding that "there is no fundamental distinction between automobile negligence situations and other negligence scenarios." *Id.* at 19, 619 N.E.2d at 720.[2] The Illinois court, instead, limited immunity to "conduct [that] concerns parental discretion in discipline, supervision and care of the child." *Id.* at 28, 619 N.E.2d at 729. The court stated:

[I]mmunity should afford protection to conduct inherent to the parent-child relationship; such conduct constitutes an exercise of parental authority and supervision over the child or an exercise of discretion in the provision of care to the child. These limited areas of conduct require the skills, knowledge, intuition, affection, wisdom, faith, humor, perspective, background, experience, and culture which only a parent and his or her child can bring to the situation; our legal system is ill-equipped to decide the reasonableness of such matters.

*Id.*

■ Parental immunity in Tennessee is limited to conduct that constitutes the exer-

---

**2.** Whether the examples mentioned in *Cates* would qualify for immunity in Tennessee would depend upon the context in which the acts by the parent were performed as well as the very nature of the acts.

cise of parental authority, the performance of parental supervision, and the provision of parental care and custody. The operation of an automobile under the circumstances alleged in this case is not protected conduct under this standard.

■ This decision applies to all cases tried or retried after the date of this opinion and all cases on appeal on the date of this opinion in which a claim challenging the parental immunity doctrine was asserted in the trial court and preserved for appeal. *See Cook v. Spinnaker's of Rivergate*, 846 S.W.2d 810, 812 (Tenn.1993). Those cases in conflict with this decision, including *McKelvey v. McKelvey* and *Barranco v. Jackson* are overruled.

The judgments of the trial court and the Court of Appeals are reversed, and the case is remanded for further proceedings consistent with this opinion.

Costs are taxed to the appellee, Susan M. Holmes.

DROWOTA, O'BRIEN and ANDERSON, JJ., concur.

DAUGHTREY, J., not participating.