IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 1, 2000 Session

# NORMA M. SHEUCRAFT, ET AL. v. DEWEY LEE ROBERTS, III

**Appeal from the Circuit Court for Davidson County**
**No. 96D-320      Marietta M. Shipley, Judge**

---

**No. M1999-01645-COA-R3-CV - Filed December 13, 2000**

---

This is a custody dispute between the maternal grandparents, Petitioners, and the biological father, Respondent. The child, Lexie, was born to Dewey and Lisa Roberts in October of 1991 and was seven years of age at the June 1999 trial.  In 1995, Dewey Roberts and Lisa Sheucraft Roberts separated, and Lisa Roberts and Lexie moved in with the Petitioners.  Ms. Roberts and the child continued to reside with the Petitioners until her unexpected death in 1998 from a brain aneurysm related to a cocaine overdose.  The Respondent has a history of drug and alcohol abuse and, at the time of trial, was involved in an abusive relationship with a female companion.  The trial court, applying the "substantial harm" test of *Bond v. McKenzie*, 896 S.W.2d 546 (Tenn. 1995), found that to change the residential arrangements from the grandparents' home to the father's home would be devastating to the child and would result in substantial harm to her.  The trial court further found that it is in the child's best interests to spend the majority of her time with the maternal grandparents. Respondent appeals and we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which PATRICIA J. COTTRELL, J., joined. BEN H. CANTRELL, P.J., M.S., not participating.

Randle W. Hill, Jr., Nashville, Tennessee, for the appellant, Dewey Lee Roberts, III.

Phillip Robinson, Nashville, Tennessee, for the appellees, Norma M. Sheucraft and Lowell Dean Sheucraft.

## OPINION

Lexie Roberts was born on October 11, 1991, to Dewey Lee Roberts, III and Lisa Sheucraft Roberts.  The Roberts were separated on July 1, 1995.  Ms. Roberts and Lexie moved in with the Petitioners, the child's maternal grandparents.  On August 19, 1996, Lisa and Dewey Roberts were divorced.  The Roberts were awarded joint custody of the child with Lisa Roberts having primary residential custody.  The Respondent was provided visitation and ordered to pay child support.

Lisa Roberts and Lexie continued to live with the Petitioners until Ms. Roberts' death. While at her boyfriend's residence with the child, Ms. Roberts suffered a brain aneurysm resulting from a cocaine overdose. Lexie discovered her mother on the couch, and was unable to awaken her. The child called the Petitioners for assistance, but Lisa Roberts died on September 30, 1998, as a result of the aneurysm.

At the time of her mother's death, Lexie had lived with the Petitioners for over three years and had been cared for by them in whole or in part since her birth. Following the funeral, the Respondent thought the child should remain with the Petitioners. Several weeks later, after no effort to take custody of the child, the Respondent expressed his intention to remove his daughter from the Petitioners' care.

On November 20, 1998, the Petitioners filed a Petition for Custody using the style of Lisa and Dewey Roberts' divorce action. The petition alleged that they were the parents of Lisa Roberts, that the child and Ms. Roberts had moved into their residence in 1995 and stayed there on a continual basis until Ms. Roberts' death, that the child remained with them after her mother's death, and that the child considers the Petitioners' home as her own. Further, the petition alleged instability on the part of the Respondent, that he had a troubled work history, that he was addicted to illegal, narcotic drugs, that he abused alcohol, that he failed to pay child support, that he was unable to maintain an independent residence, that he was residing with a female companion, and a general instability in lifestyle. The Petitioners requested that temporary and permanent custody be vested in them because removing the child from the Petitioners home would cause serious emotional harm and it was in the child's best interest to remain with the Petitioners.

In conjunction with the Petition for Custody, the Petitioners sought a restraining order enjoining the Respondent from interfering with the Petitioners' temporary custody. The trial court granted the temporary restraining order, and at the ensuing show cause hearing, continued the restraining order on the basis that it was in the best interest of the child that the status quo be maintained.

On February 26, 1999, the Respondent filed a motion for judgment on the pleadings in conjunction with his answer to the Petition for Custody. The trial court denied the motion. The Respondent's answer denied that the Petitioners are financially, physically, and emotionally able to provide for the child. Further, the Respondent denied that he is unstable, lacks responsibility, fails to provide for, visit, or attend to the child's needs or that he has personal and emotional problems or physical addictions.

On March 26, 1999, the Petitioners filed an Amended Petition for Custody changing the caption to reflect their names and adding allegations of domestic violence between the Respondent and his female companion.

This case was tried in June of 1999. The trial court made a dual analysis under both the "substantial harm" framework of *Bond v. McKenzie*, 896 S.W.2d 546 (Tenn. 1995) and the factors

under the parenting plan legislation codified as T.C.A. Section 36-6-106. We affirm the trial court's finding under the substantial harm framework by placing custody with the Petitioners. However, we do not approach the issue of custody under the parenting plan legislation as did the trial court. Since we affirm the finding of substantial harm, there is no need to address the dual approach method the trial court developed in its memorandum opinion.

The trial court found Mr. Roberts has a very uneven employment history, he has never had a residence of his own[1], he admitted to a continuing use of drugs over the past ten years, he has used powder cocaine, marijuana, mushrooms, and LSD, he regularly uses alcohol to excess, he admits that he might be an alcoholic, his female companion took out an Order of Protection against him which she later dropped, his relationship with his female companion is unstable, he did not attend any of the child's school functions or conferences[2], he allowed the child to get sunburned so severely she had to seek medical attention, and he received Social Security checks for Lexie based on her deceased mother's work record, promptly quit his job, and spent the Social Security for his own living expenses.

These findings of fact by the trial court are based in large part on the testimony of the respondent which testimony is hardly short of amazing. Excerpts from the testimony of Dewey Lee Roberts, III disclose:

> Q.  Okay. All right. Mr. Roberts, let's talk just a second about your employment. When you and Ms. Roberts were living together, you had your own insurance agency; is that correct?
> A.  That's correct, sir.
> Q.  And you had that for how many years?
> A.  12-years, sir.
> Q.  Now, in 1996 the State Insurance Commission took your license away from you, they suspended it, correct?
> A.  I turned my license in, sir.
> Q.  At their request, though, correct?
> A.  Yes, sir. I guess you could say that.
> Q.  Now, the reason that that happened is you were taking premium payments from your clients - - customers - - and you weren't buying their insurance, correct?
> . . . .
> Q.  And the result is, some people ended up without insurance; isn't that correct?
> A.  Yes, sir. Or they had a lapse between the time they paid it and the time I took it in.

---

[1] The Respondent argues on appeal that his testimony contained an assertion that prior to March of 1996, he did have his own residence.

[2] The Respondent argues on appeal that his testimony contained information that he did attend one school function, a carnival, and submits that the Petitioners were not informative of school functions.

Q.     And, as Ms. Reese said in her opening statement, you had to settle up with some of those people, didn't you?

A.     I had to send the premiums in that were paid to me, which was deposited in my account, and I wrote checks on those and sent them - - sent them to the insurance company, yes, sir.

Q.     Now, Mr. Roberts, during this period of time - - and I think that occurred after you and your wife's separation and before the divorce. The truth is, a year or so before that, and even during this period, was the period that you were using cocaine, correct?

A.     Can you state the time period again, sir?

Q.     From early '96 '95, 94 and, in fact, all of '96, were periods that were using cocaine, correct?

A.     Yes, sir.

Q.     And the fact of the matter is, sometimes you used money inappropriately and you used it for the drugs, didn't you, sir?

A.     I deposited the money in into my account, sir.

Q.     Answer my question. Did you not use the money that you were supposed to be using in your insurance business for drugs?

A.     Yes, sir.

As to his long-standing addiction to drugs and alcohol, Mr. Roberts testified:

Q.     During this time, you were still using cocaine; is that correct?

A.     During what time?

Q.     During this - - January; February; March; April of 1998?

A.     No, sir.

Q.     When did you stop using cocaine?

A.     Sometime, I think, around the first of January.

Q.     Of 1998 - - 1998?

A.     Yes, sir.

Q.     About ten years, hadn't you?

A.     About ten years.

Q.     Used cocaine; and that's snorting it up your nose, correct?

A.     Yes, sir.

Q.     Did you smoke crack cocaine?

A.     No, sir.

Q.     You've never done that?

A.     No, sir.

Q.     Have you ever tried LSD?

A.     Mushrooms? Yes, sir.

Q.     So psychedelic mushrooms. Have you ever taken Val[i]um that wasn't prescribed for you?

A.     No, not much on pills?

Q.     So your answer is "No"?

-4-

A.    I probably have, but at the time - - I can't remember back that far.

Q.    You have smoked marijuana - -

A.    Yes, sir.

Q.    - - for some period of time, correct?

A.    Yes, sir.

Q.    And the truth of the matter is, Derrek Sheucraft - - you and Derrek Sh[e]ucraft, on a regular basis, would meet over on West End and go back to the insurance agency and you all would use drugs there, didn't you?

A.    Yes, sir, that's correct.

Q.    And that went on for a long period of time, correct?

A.    Yes, sir.

Q.    And the fact of the matter is, you and your wife, Lisa Sheucraft, used drugs during your marriage, didn't you, sir?

A.    Derrek, Lisa and myself, all did.

                                    . . .

Q.    All right.  Now, you've told - - Let's go back to the drug incident.  You told me that you stopped using drugs in January of 1998, but that's not true.  You started using them again, didn't you?

A.    There was sometime in '98 that sporadically maybe I used them.

Q.    And there was particular incident you know about 'cause you admitted yourself in September - -

A.    Right.

Q.    - - where C.C. caught you using drugs at the Seventh Avenue apartment, correct?

A.    I - - yes, sir.

Q.    And that incident, you were in the bathroom and C.C. came in and you had the cocaine on her make-up mirror - - her round make-up mirror; do you remember that?

A.    Yes, sir I do.

Q.    And C.C. was outraged and blew it all over the floor, didn't she?

A.    She threw it away.

Following the death of his wife, Mr. Roberts began a relationship with Connie Coursey Seay ("C.C."), which can only be described as stormy and unstable.  Mr. Roberts admitted that in October 1998 he had assaulted Ms. Seay and in December 1998, during an argument with Ms. Seay, he had kicked down the Christmas tree in her apartment.  He further admitted that on March 8, 1999, he pulled the television set out of the wall and cut his hand.  He further admitted that in March 1999, in a display of anger, he struck the windshield of his vehicle with his fist, breaking the windshield with Ms. Seay present.  He admitted that he and Ms. Seay had numerous arguments and fights and that they yelled, cursed one another, and called each other various names.

The total irresponsibility of Mr. Roberts is no where better evidenced than by his use of Social Security money intended for Lexie.

-5-

Testifies Mr. Roberts:

Q. Now, Sometime in November, you went to Social Security. What did you find out that you were entitled to as a result of your wife's death - - Lexie was entitled to payments, correct?

A. There was - - when I first went, they gave me a booklet and gave me some information to fill out. It was kind of explained to me vocally, there wasn't any paperwork like this. There was - - the way she explained to me was $750 that was applied to Social Security and it was, like, $255, for which - - which - - she, obviously said something about how I was going to get the $255. I think it was only a one-time payment, though, after - - after I found out and researched a little bit.

Q. Now, the truth is, Mr. Roberts, the $250 that you received as the one-time payment was supposed to go to your wife's burial; you're aware of that, aren't you?

A. No, sir, I was not.

Q. You never heard that before?

A. No, sir.

Q. Okay. Now, coincidentally - - This was in November - - coincidentally, that was the same month that you decided that you were going to quit your job at Mattress Firm, correct?

A. I don't recall what date - - what - - actually - - what date it we went to the Social Security.

Q. All right. Now, let me ask you this: When did you get your first check for Lexie?

A. I think sometime in December.

Q. Okay.

A. I'm not correct on the date.

Q. And you got that check - - it was really retroactive through October, wasn't it?

A. I believe it was two payments.

Q. All right. How much did you get in the total check?

A. I think it was like $2,000.

Q. Now, the truth is, that in deposition, I asked you about - - that on Page 73 - - I asked you what you were doing with that money; do you remember what you told me?

A. No, sir, I do not.

Q. All right. Do you remember telling me that you put it in a savings for Lexie and you put all of it in a savings account?

A. Yes, sir, I do.

Q. And the fact of the matter is, you haven't put it in any savings account for Lexie, have you?

A. It was deposited in there. It's on the paperwork, if you want to look for the deposit on the amount of the check, I believe. I know I saw a - - possibly $1,020 on several different bank statements.

. . . .

Q. Now, the fact of the matter is, you were just putting these checks into your personal checking account, weren't you?

A. They were deposited in my account, sir.

Q. All right. And you continued to get checks all the way up through, what, March?

A. I believe the last check was March - - end of February - - I think March.

Q. And all of those were deposited in your personal account, correct?

A. Yes, sir.

Q. Now, Mr. Roberts, the fact of the matter is, you have now spent all of that money, haven't you, sir?

A. I believe you have the paperwork on that, sir, in the deposition.

Q. All right. Is it your testimony you still have some of it left, or you spent it all?

A. No, sir.

Q. "No" what?

A. No, sir. Which - - which question were you answering?

Q. Do you still have any of the money left?

A. No, sir, I do not.

Q. All right. The total amount that you received, as per your interrogatory answer, was $6,068?

A. Yes, sir.

Q. And at that time you testified - - and these were dated - - let's see - - dated May the 19th - - Is that your signature on those interrogatories? (Document passed to witness.)

A. That's correct.

Q. May the 19th?

A. Yes, sir.

Q. And you show what some of the payments were. Incidentally, you said that - - you said at that time you really had $522 left; do you remember that?

A. Right.

Q. The total amount you're currently holding on behalf of your daughter, you put $522. But when we asked the balance in your Tennessee Teacher's Credit account, it shows a zero?

A. Yeah. There's no longer a balance there.

Q. Now, you say on here that you had paid Ms. Sheucraft $740 of that money, correct?

A. Okay.

Q. The truth is, you really didn't. You made payments to them in October and November, but you didn't pay them any o this money, 'cause you didn't get this money 'til January?

A. Yeah, that's correct.

This graphic testimony of Dewey L. Roberts, III is coorborated in great measure by the testimony of his girlfriend, Connie Coursey Seay, particularly in relation to drug and alcohol abuse

by Dewey Roberts and the many incidents of violent behavior of both herself and Dewey Roberts.

It is well to keep in mind that this is a contest between a parent and a non-parent over custody of a child and at this point, we are concerned with neither comparative fitness nor a "best interest of the child" analysis. The Supreme Court has held:

> Tennessee courts have historically held that,
>> a parent is entitled to the custody, companionship, and care of the child, and should not be deprived thereof except by due process of law. It is a natural right, but not an inalienable one. The parents are trusted with the custody of the child upon the idea that under the instincts of parental devotion it is best for the child.
>
> *Hawk v. Hawk*, 855 S.W.2d 573, 577 (Tenn. 1993) (quoting *State ex rel. Bethell v. Kilvington*, 100 Tenn. 227, 236, 45 S.W. 433, 435 (1898)). In *Nale v. Robertson*, 871 S.W.2d 674, 680 (Tenn. 1994), the Court stated:
>
>> This Court found in *Davis v. Davis*, 842 S.W.2d 588, 600 (Tenn. 1992), that "there is a right of individual privacy guaranteed under and protected by the liberty clauses of the Tennessee Declaration of Rights." This constitutional right of privacy includes parental rights. In light of this right to privacy, we believe that when no substantial harm threatens a child's welfare, the state lacks a sufficiently compelling justification for the infringement on the fundamental right of parents to raise their children as they see fit.
>
> *Hawk v. Hawk*, 855 S.W.2d 573, 577 (Tenn. 1993); *see also Broadwell v. Holmes*, 871 S.W.2d 471 (Tenn. 1994).
>
> Therefore, in a contest between a parent and a non-parent, a parent cannot be deprived of the custody of a child unless there has been a finding, after notice required by due process, of substantial harm to the child. Only then may a court engage in a general "best interest of the child" evaluation in making a determination of custody.

*In re Adoption of Female Child* (*Bond v. McKenzie*), 896 S.W.2d 546, 547-48 (Tenn. 1995); *see also In re Askew*, 993 S.W.2d 1 (Tenn. 1999).

Thus, as held by the trial court, the first and foremost issue is under a "substantial harm to the child" analysis.

With Lexie facing the trauma of the death of her mother, together with the drug and alcohol abuse of her father, and the violent and confrontational behavior of Dewey Lee Roberts, III and his girlfriend, Connie Seay, the Sheucrafts sought professional help for her in the person of Dr. Jay Woodman, a practicing clinical psychologist in Nashville. Dr. Woodman met with Lexie twenty-two (22) times, from September of 1998 until the time of the trial, also meeting with the Sheucrafts, Dewey Roberts, III, and Connie Seay. Dr. Woodman opined:

> The impact of the loss of Lexie's mother is profound. This has emotional implications for her well into her adult years. The dramatic nature of the loss and possible change in her life circumstances cannot be taken lightly due to the serious implications for her.
> The relationship with her grandparents, the Sheucrafts, is of primary importance in maintaining her development and emotional stability. . . . Lexie views their relationship as the central one in her life. Lexie's relationship with her father is strained. I have serious questions as to his ability to consistently follow-with her needs and Lexie's current emotional connection to him.
> The impact of moving Lexie from the Sheucraft's will result in serious emotional harm that would not likely be reversible under the current circumstances. The Sheucraft's continued connection in the role of being a parent is essential to this child's mental health.

After a four day non-jury trial, in which all parties had full notice and ample opportunity to present proof and argument, the trial court applied the "substantial harm" standard holding:

> The court reluctantly finds that under all standards of unfitness, substantial harm, presumption of natural father over any third party, giving Mr. Roberts "sole custody" at this time in Lexie's life, would produce substantial emotional harm for her future and would put her at risk, preventing her from becoming a healthy productive adult. The court cannot experiment with this child.
> . . . .
> The court finds that even using the extreme standard of "substantial harm" a decision to place the child with the father would be devastating for the child.

Our review of this finding is *de novo* upon the record of the trial court, accompanied by a presumption of correctness, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *Ganzevourt v. Russell*, 949 S.W.2d 293 (Tenn. 1997).

The evidence in this case certainly does not preponderate against the finding of the trial court that "substantial harm" would threaten this child's welfare if custody were awarded to the natural father, Dewey Lee Roberts, III.

Having decided the threshold "Hawk-Bond Agnew" issue against the natural father, the trial court then proceeded with the "best interest of the child" analysis mandated by the same cases.

As to Mr. and Mrs. Sheucraft, the trial court found:

Ms. Sheucraft is 56. She most recently worked at Nashville Tech until her daughter died. She felt it was important to stay home with Lexie. The Sheucrafts have four remaining children, triplet daughters and a son. All of them had at least three years of college and have good jobs. [Lisa, the deceased mother, had been fired at her last job due to a bad drug screen.] Mrs. Sheucraft is healthy. She takes blood pressure medicine, Premarin, Zoloft and Synthroid. She had a foot operation last summer. The worst accusation that can be leveled against the Sheucrafts was that Lisa took drugs and Derrick procured and used drugs with Lisa and Dewey Roberts. Either the Sheucrafts didn't know, did not take such behavior seriously or believed their children without checking other sources for credibility. That is a serious accusation and one that the Sheucrafts have paid for with the loss of their daughter.

Lexie and the Sheucrafts were strongly attached before and during the death of their daughter. Lexie called them first to tell them her mother would not wake up. When they eventually found out where Lexie was, their first thought was of Lexie. [Mr. Sheucraft] went directly to find Lexie and his comatose daughter. Ms. Sheucraft stayed on the phone until [Mr. Sheucraft] got to the scene. Once he looked in on the medics to see that his daughter was in good hands, he went directly to Lexie's side and was more concerned about her than dealing with his own grief and horror. When it appeared that her daughter was dying, Ms. Sheucraft talked to Lexie about whether her mother should be buried or cremated, realizing that Lexie would have to live with the decision. When Lexie asked if she could keep the ashes, then the decision was made.

Lexie and her mother lived with the Sheucrafts from the date of the separation until the date of her mother's death, almost half of Lexie's seven years. The Sheucrafts were very involved in Lexie's life prior to that death. Prior to the separation, Lexie and Lisa stayed at their house often. After the separation, they were even more involved. Mr. or Ms. Sheucraft bathed her most evenings, took her to school most every day, purchased all her clothing. She had her own room which the Sheucrafts furnished lavishly with her toys. She was allowed to have five cats at their house. The three of them took trips quite often.

Since the death of their daughter, Ms. Sheucraft has been the primary parental figure in Lexie's life. She went to school and stayed with her for the first four to six weeks following her mother's death. She and Mr. Sheucraft and the family members were totally involved in the school, from room parties to the fairs to the school conferences. She and Mr. Sheucraft have somehow shepherded her during this difficult time, so that at least outwardly she has done well at school and appears to be as happy as she can. They have followed her emotional lead as she moves from one grief stage to another. It appears that she is doing relatively well. Ms. Sheucraft

did nothing to prevent her father from seeing her. In fact Mr. Roberts was grateful that the Sheucrafts had done so much for Lexie. Even after suit was filed, Ms. Sheucraft invited Mr. Roberts and CC Seay into their home for the holidays. She took Lexie to see her paternal grandparents when they would not talk to their son. It is likely that even after this hearing is over, that the Sheucrafts will continue to create a bridge between the two families.

Mr. Sheucraft is a kind man. He is 60+ and is presently retired. It is clear that the Sheucrafts are very devoted to each other and to Lexie. He has a very loving manner about him and is not easily riled. M[r]. Sheucraft is clearly the leader in the family, but he has a quiet gentleness about him, which is a good foil for the energetic Ms. Sheucraft. The Sheucrafts have received money from Social Security since April 1999. These funds have been placed in a separate account for Lexie. They do not intend to derive a financial benefit from having Lexie live with them.

Conclusion.

There is not one good reason to remove Lexie from the Sheucrafts at this time. Her father has not earned the right to assert his constitutional rights to wrench Lexie out of the only real home she has ever had. She has done well. She needs the emotional and physical security and predictability of the Sheucraft home. Mr. Sheucraft has definitely flunked the Solomon test. He has the right to assert his constitutional right of fatherhood to claim Lexie as his child. A true father would first get his own life straight and then seek to establish a strong bond with his daughter, rather than seeking to take away Lexie's only present security. There is more to raising a child to be a productive adult than fathering one.

These findings by the trial court, made after four days of almost entirely in-court testimony, are reviewed under a time honored rule:

The findings of the trial judge in a non-jury case are entitled to great weight where the trial judge saw and heard the witnesses and observed their manner and demeanor on the stand and was therefore in much better position than the appellate court to judge the weight and value of their testimony.

*Duncan v. Duncan*, 686 S.W.2d 568, 571 (Tenn. Ct. App. 1984).

Review of this record presents some cause for concern relative to the Sheucrafts but in its "best interest" analysis the trial court did not have a choice between the Sheucrafts and something better, but rather a choice between Mr. and Mrs. Sheucraft and something far worse. The evidence does not preponderate against the decision of the trial court that the best interest of Lexie Roberts is served by vesting custody of her in her maternal grandparents.

The Respondent maintains that the trial court erred in issuing an exparte restraining order enjoining the Respondent from interfering with the temporary custody of the Petitioners. Tenn. Rule Civ. P. Rule 65.07 provides that "[i]n domestic relations cases, restraining orders or injunctions may be issued upon such terms and conditions and remain in force for such time as shall seem just and proper to the judge to whom application therefor is made, and the provisions of this Rule shall be followed only insofar as deemed appropriate by such judge."

This Court has interpreted the language of Rule 65.07 as permitting broad discretion by a trial court when issuing a temporary restraining order in domestic relations cases. *See Wilson v. Wilson*, 987 S.W.2d 555, 565 (Tenn. Ct. App. 1998). In the present case, the Petitioners made a proper application for a restraining order with the trial court and the trial court granted the request and upheld it after a show cause hearing. This was clearly within the trial court's broad discretion. It is true that the Respondent was the joint custodian, however, the child lived with the Petitioners continually for over three years and allowing the child to be removed from the Petitioners' home after the unexpected death of her mother, would have been devastating. The trial court did not change custody of the child by granting the restraining order, rather, the trial court simply maintained the status quo to prevent further harm to the child. We find the issuance of the restraining order just and proper.

Next, the Respondent maintains that the trial court erred in denying the Respondent's motion for judgment on the pleadings. The Respondent's motion alleged that the Petition for Custody should have been dismissed pursuant to Tenn. R. Civ. P. Rule 17.01 because the Petitioners were not real parties interest and it was void of any allegations of fact which supported the likelihood of substantial harm. The trial court allowed the Petitioners to file amended pleadings with a modified style of the case to reflect the maternal grandparents as Petitioners. The trial court did not abuse its discretion in allowing amended pleadings to be filed by the petitioners making clear that they were in fact the real parties in interest.

Conclusion.

In this case, the trial court faced the difficult prospect of denying a natural parent custody of his child in a contest with a non-parent wherein *Hawk, Bond* and *Agnew* provide controlling law. Given the facts established in this record the trial court felt compelled to repel the natural parent in favor of the non-parent. Our review of the evidence convinces us that in this respect the trial court judgment was the correct one and certainly the evidence does not preponderate against the judgment of the trial court. Under these circumstances we deem it unnecessary to discuss the alternative basis for the action of the trial court under the parenting plan legislation provided in Tennessee Code Annotated section 36-6-106. The trial court has given Dewey Lee Roberts, III ample opportunity to earn a substantial place in the life of his daughter. The trial court will retain jurisdiction in this case to address any future development in this respect. Whether Mr. Roberts has an expanded role in the future of Lexie Roberts is up to him.

The judgment of the trial court is affirmed and costs of this cause are assessed to Dewey Lee Roberts, III.

The case is remanded to the trial court for such further proceedings as the trial court may deem to be proper.


_____
WILLIAM B. CAIN, JUDGE