KLOPPENBURG, Respondent, v. KLOPPENBURG, Appellant

(280 N. W. 206.)

(File No. 8040. Opinion filed June 20, 1938.)

*Danforth & Davenport,* of Sioux Falls, for Appellant.

*L. E. Waggoner* and *R. C. Riter,* both of Sioux Falls, for Respondent.

POLLEY, J.   This action was brought to recover damages caused by an auto wreck that took place on Highway No. 16, between Blue Earth and Fairmont in the state of Minnesota on the 15th day of August, 1935.   The defendant, Earl Kloppenburg, who was driving the car, was then a minor 16 years of age and the plaintiff, Lucille Kloppenburg, is his mother.   Because of our statute, commonly known as the "automobile guest statute" (Ch. 147, Laws 1933), the action could not be maintained under the laws of this state; but the cause of action arose in Minnesota where there is no law similar to our Chapter 147, and the action is maintainable under the laws of Minnesota; provided, however, that the minor has been emancipated by his parents prior to the occurrence of the accident that gave rise to the cause of action; and to meet this exigency, plaintiff alleged in her complaint that prior to the accident:

"Said defendant was by the plaintiff and her husband, E. H. Kloppenburg, duly and legally emancipated by an agreement between the said defendant and his parents, and by the terms of which it was agreed that the plaintiff and her husband would no longer be responsible for the debts of said defendant and that any and all wages earned by the said defendant should belong to him."

To establish the right to maintain the action in Minnesota the following decisions by the Supreme Court of that state were introduced in evidence: Taubert v. Taubert, 103 Minn. 247, 114 N. W. 763; Lufkin v. Harvey, 131 Minn. 238, 154 N. W. 1097, L. R. A. 1916B, 1111, Ann. Cas. 1917D, 583; Lund v. Olson, 183 Minn. 515, 237 N. W. 188, and Belleson v. Skilbeck, 185 Minn. 537, 242 N. W. 1.   That such decisions do establish the right in that state no question is raised; provided, of course, that emancipation had taken place prior to the accident.   Respondent having asserted emancipation has the burden of proving the existence of the same.   The appellant contends that no emancipation has been shown.

At the close of the testimony the defendant moved the court to direct a verdict in favor of the defendant and against the plaintiff on the ground that there is no evidence in the record on which the jury could find that the defendant, Earl Kloppenburg, had been emancipated by his parents, Lucille and E. H. Kloppenburg. The motion was overruled and the case was submitted to the jury. The verdict was in favor of the plaintiff, but before judgment was entered defendant moved for judgment n. o. v. on the same ground that he moved for a directed verdict. This motion like the other was overruled by an order that was made and filed prior to the entry of judgment.

The appeal is from the judgment alone, and quoting from respondent's brief:

"There is only one question involved in this case, namely: the question of emancipation, * * *. Hence, the only question which could be involved is whether or not there is any credible evidence to go to the jury upon the question of whether or not the defendant had been emancipated."

The claimed emancipation was the result of several conversations that took place between the defendant, Earl Kloppenburg, and Edward H. Kloppenburg, his father. The first conversation occurred about the latter part of May or early part of June, 1935, and prior to the close of school in the spring of 1935. What was said at that conversation does not appear from the record; but about the first of August other conversations occurred . Edward H. Kloppenburg testified that:

"Earl came and he wanted to go to school, military school, and as I told him before, it would be hard for me to send him. It would be robbing the other children. I told him and he said he could be his own boss, he could do as he liked; he could go and earn his own money in the summer months; he could go to school and pick his own school, his own profession, and what money he lacked on putting him through school I would help him, but when he finished school he had to return that money to me, pay it back so I could help educate the rest of the children. He said he would agree to do that, and when he got through school and established he would pay me back."

On cross-examination, Mr. Kloppenburg testified:

"When I had that conversation with my boy, he was going to be seventeen. He was just lacking a month. At that time he was a sixteen year old boy. He had just finished his sophomore year in high school. As to his business experience, he had worked that summer, (meaning the summer 1935). * * * I think he started working for them the first week in June, as soon as school was out, and at the time of our conversation (about August 1st) he had worked there approximately two months. I think he earned $10.00 a week. He did not pay any board out at my house and roomed and had his meals there with the family all summer. He occupied the same sleeping quarters or room he had previously, and remained a member of the family circle just as he had before. At the time of the accident he was still living with us in the home."

"Q. Now you didn't mean by that talk did you, that you were turning your sixteen year old boy loose on the world and entirely loose from you and your wife, did you? A. Yes.

"Q. You did—that he was to do just exactly as he wanted to from that time on? A. Yes.

"Q. And he was to have no directions from you whatever? A. No.

"Q. And he could do whatever he wanted to? A. He could do—he was going to be in school for the next seven years.

"Q. Suppose the boy had decided that he would quit school and go to bootlegging, or something of that sort, would that have been all right with you? A. He's not that kind of a boy and won't do it.

"Q. Suppose that he concluded that he would quit school and go to bootlegging to make a living, is that all right with you? A. No.

"Q. Of course it wouldn't, would it? A. No, but he won't.

"Q. If he had done it you would have felt free to interfere with him and tell him not to. A. Just the same as if he was twenty-one.

"Q. You would have felt free, to interefere and stop him? A. Yes. Our agreement he was to go to school.

"Q. If he had done anything of that kind you would have interefered. A. I would with any of my children, no matter how old they were.

"Q. What you wanted him to do—you didn't want your sixteen year old kid to quit school when he just completed his sophomore education? A. He wasn't going to.

"Q. That don't answer the question. You didn't want your sixteen year old kid to quit school? A. No, indeed not. Our agreement was that he would continue school.

"Q. If your boy, following that conversation, had proposed to quit school, you would have insisted, of course, that he go on and continue school? A. I would want him to go to school.

"Q. If your 16 year old boy at that time had insisted on quitting school, you would have insisted that he go on and continue school? A. Yes.

"Q. And so you did retain, of course, the right to direct your boy in major things of that kind, didn't you? A. I have up until now, (May 19, 1936). I do not still have that right. I did until we come to our agreement and he went to school. I do not still understand, after that conversation, that I still have the right to control him in the major things, such as whether he goes to school or not. I have not felt, after that agreement, that if he decided to quit school, I had any right to stop him. He was his own boss. It is hard telling whether I would expect, under those circumstances, that he would obey me. I would give him my advice."

Defendant went to school—a boy's military academy of his own selection in St. Paul. His father paid his tuition and expenses to the amount of $710 for the first year, and in addition to that sent him regularly $10 a month for spending money. "I have not directed him as to what he should or should not do since that conversation because he has been away to school."

The witness, Edward H. Kloppenburg, testified that immediately after having the conversation, above set out with his son, he informed his wife, the plaintiff herein, of the arrangement he had made with Earl, the defendant herein, and that she approved the arrangement in all particulars. And on cross-examination she testified relative to the defendant:

"Q. And he has been a good obedient boy, has he? A. He has been a very good boy.

"Q. And has he done what you told him? A. Yes, we have had no trouble raising Earl.

"Q. And that was still the case during last summer was it? A. Absolutely.

"Q. And that is when he was with you and in your charge and you would tell him to do something or not do something, why he obeyed you, did he? A. Very much so. He is a very easy boy to handle.

"Q. And looked to you for advice and direction when he was with you and in your charge, I assume? A. I think so, yes.

"Q. And there has never been any talk or conversation between you and your husband and Earl by which you gave up or relinquished any of your rights to Earl? A. My rights as a mother to Earl?

"Q. Yes. A. Why, I couldn't say that.

"Q. That is, you feel that you do now and that you had last summer substantially the same rights with reference to Earl that any mother would have at that time over a 17 year old boy, that is about correct isn't it? A. Well I should think so, yes."

Does the arrangement brought about by the foregoing conversations constitute an emancipation of the defendant, Earl Kloppenburg? We do not think so. In the first place, assuming that the conversation that took place between Earl Kloppenburg and his father about the 1st of August, 1935, was sufficient to constitute an emancipation, such emancipation had not gone into effect at the time of the accident. This fact is specifically shown by the testimony of Edward H. Kloppenburg. This conversation took place at least two weeks prior to the accident. During this interval and afterwards until Earl went away to school, he continued to live at home with his parents just as he had always done. There was no change in his way of living, or any act whatever by either Earl or his parents that indicated that he had been emancipated, nor was his conduct or his way of living after he went away to school at all different from that of hundreds of other boys who go away from home to school at their father's expense.

Emancipation is of two kinds: implied and express. Implied emancipation "is where the parent, without any express agreement by his acts or conduct, impliedly consents that his infant child may leave home and shift for himself." "Express emancipation takes place when the parent agrees with his child, who is old enough to take care of and provide for himself, that he may go away from

home and earn his own living, and do as he pleases with the fruits of his labor." Brosius v. Barker, 154 Mo. App., 657, 136 S. W. 18, 20. But there must be the further element of entire surrender of care and custody of the child as well as a renunciation of parental duties. The "test to be applied is that of preservation or destruction of parental and filial relations." 1 Words and Phrases, Fourth Series, p. 476. There was no such severance of relations in this case, and there was to be a continuation "of parental and filial relations."

The claimed emancipation in this case was by express agreement. The agreement between the father and son makes provision for no renunciation of parental duties or destruction of filial relations. Indeed, it is no more than an agreement by which the father agrees to pay the son's tuition and board, buy his clothes and other necessaries, and give him $10 per month for spending money for at least seven years, provided the son will continue in school for that length of time. The testimony of Edward H. Kloppenburg further shows that he had, and intended to continue to have, just the same interest in his son's welfare that he had always had, and intended to continue to control his course of conduct for at least seven years to come. In the language of the witness: "Our agreement he was to go to school." And again, "Our agreement was that he would continue school." It is strange indeed, that the members of this family should have had the conversation above narrated, laying a perfect foundation for the maintenance of this action, just two weeks prior to the happening of the event out of which the cause of action was to arise.

Up to the time of the trial of this action Earl continued to rely upon his father for advice and guidance just as he had always done, and continued to live at home and continued to remain a member of the family just as he had always been. When this action was started and it became necessary for the appointment of a guardian ad litem to defend this action, he selected his father, Edward H. Kloppenburg, to act as such guardian ad litem and he is now acting as such guardian ad litem and is now in charge of the defense of the action.

We fail to find any credible evidence in the record that would warrant or support a verdict for the plaintiff and the court should have granted defendant's motion for a directed verdict.

The judgment appealed from is reversed.

ROBERTS, P. J., and RUDOLPH and SMITH, JJ., concur in result.

WARREN, J., concurs.