872 So.2d 138 (2003)
Anna Belle NEWMAN, as personal representative of the estate of Clinton Patterson Cole, a minor, deceased
v.
John COLE and Tara Cole.
1012110.
Supreme Court of Alabama.
July 18, 2003.
*139 Dennis R. Weaver and Page Stanley Ellis of Cory, Watson, Crowder & DeGaris, Birmingham, for appellant.
Craig W. Goolsby and Jeremy P. Taylor of Carr, Allison, Pugh, Howard, Oliver & Sisson, P.C., Daphne, for appellees.
Rhonda Pitts Chambers of Taylor & Taylor, Birmingham, for amicus curiae National Crime Victim Bar Association, in support of the appellant.
Leigh King Forstman of Pittman, Hooks, Dutton, Kirby & Hellums, P.C., Birmingham; and David G. Wirtes and George M. Dent III of Cunningham, Bounds, Yance, Crowder & Brown, L.L.C., Mobile, for amicus curiae Alabama Trial Lawyers Association, in support of the appellant.
PER CURIAM.
In this wrongful-death action, Anna Belle Newman, the personal representative of the estate of the decedent, Clinton Patterson Cole ("Clinton"), sued Clinton's father, John Cole, and his stepmother, Tara Cole (sometimes referred to hereinafter collectively as "the Coles"), for allegedly causing Clinton's death. Newman's complaint asserted claims of negligence, wantonness, and willful and intentional conduct.
The Coles moved to dismiss the complaint based on the doctrine of parental immunity. That doctrine was judicially created in the case of Hewellette v. George, 68 Miss. 703, 9 So. 885 (Miss.1891), abrogated by Glaskox v. Glaskox, 614 So.2d 906 (Miss.1992), and was adopted by the this Court in Owens v. Auto Mutual Indemnity Co., 235 Ala. 9, 177 So. 133 (Ala. 1937). The present form of the doctrine in this State was most recently discussed by the Court of Civil Appeals:
"Under Alabama law, `[t]he parental immunity doctrine prohibits all civil suits brought by unemancipated minor children against their parents for the torts of their parents.' Mitchell v. Davis, 598 So.2d 801, 803 (Ala.1992). Only one exception to this rule has emergedwhen a child alleges sexual abuse by a parent, the parental immunity doctrine will not bar an action against the parent, although proof of the alleged conduct must be tested under a `clear and convincing' standard. Hurst v. Capitell, 539 So.2d 264, 266 (Ala.1989)."
Hinson v. Holt, 776 So.2d 804, 811 (Ala. Civ.App.1998).
*140 On July 3, 2002, the trial court granted the Coles' motion to dismiss the complaint. Newman appealed, arguing that this Court should abolish the doctrine, or, in the alternative, craft an exception to the doctrine that encompasses the facts alleged in this case.

I. Facts
Clinton was 16 years old at the time of his death, which occurred during an altercation with his father over Clinton's failure to perform household chores; Newman asserts that the altercation ended with the father's striking Clinton repeatedly in the chest and then holding him on the ground in a "choke hold" while Tara Cole sprayed him in the face with water from a garden hose. The father held Clinton on the ground for approximately 20 minutes; he let go of Clinton when a police officer arrived. Clinton was unconscious, and he was taken to a local hospital; he died the next day.

II. The Legal Issue
Although the facts in this case are tragic and compelling, the legal issue is clear-cut: Whether this Court should abolish the doctrine of parental immunity, or to what extent, if any, it should modify the application of the doctrine in light of the circumstances of this case. We hold that a further exception to the doctrine should be recognized where it is shown by clear and convincing evidence that a parent's willful and intentional injury caused the death of his or her child.
Newman asserts that Alabama is the last state not to have entirely abrogated or significantly modified the doctrine. Newman's argument, supported by the briefs of amici curiae National Crime Victims Bar Association and Alabama Trial Lawyers Association, asserts that to apply the parental-immunity doctrine in the circumstances of this case is fundamentally unjust and contrary to long-settled principles of tort law. Newman and the amici support their argument by noting the large number of other states that have abrogated, or significantly modified, the doctrine.[1] Newman argues that this Court should abrogate the doctrine entirely, or, alternatively, either craft an exception to the doctrine in the case of a parent who intentionally or willfully and wantonly injures his or her child, or craft an exception for a wrongful-death action in which a parent is accused of causing a child's death. Newman and the amici assert, without significant rebuttal from the Coles, *141 that Alabama's application of the doctrine is the strictest imposition of parental immunity against minors in the United States.
The Coles, on the other hand, argue that the Legislature is the entity that should make any changes to the settled doctrine of parental immunity, and that abrogation of the doctrine would adversely impact families and give rise to unwarranted lawsuits by unemancipated minors against their parents.
Thus, the parties' arguments offer the Court three options: (1) we might simply decline to interfere with the doctrine, (2) we might abrogate the doctrine entirely, or (3) we might craft an exception to the doctrine, as we did in Hurst v. Capitell, 539 So.2d 264 (Ala.1989), to fit the circumstances of this case.
We discussed the history of the doctrine in this State, and the rationale for crafting an exception, in Hurst:
"The parental immunity doctrine had its genesis in the United States in Hewellette v. George, 68 Miss. 703, 9 So. 885 (1891), abrogated by Glaskox v. Glaskox, 614 So.2d 906 (Miss.1992), in which a minor daughter was precluded from suing her deceased mother's estate for damages resulting from mental suffering and injury to her character incurred during her confinement in an asylum for 11 days caused by her mother. The court gave this reason for its holding:
"`The peace of society, and of the families composing society, and a sound public policy, designed to subserve the repose of families and the best interests of society, forbid to the minor child a right to appear in court in the assertion of a claim to civil redress for personal injuries suffered at the hands of the parent. The state, through its criminal laws, will give the minor child protection from parental violence and wrongdoing, and this is all the child can be heard to demand.'
"68 Miss. at 711, 9 So. at 887.
"The parental immunity doctrine was not based upon English common law, statutes, or previous cases; rather, it was judicially created by the Mississippi Supreme Court. In fact, even the Hewellette opinion recognized the limitation on the application of parental immunity to those cases involving unemancipated children:
"`If ... the relation of parent and child had been finally dissolved, insofar as that relationship imposed the duty upon the parent to protect and care for and control, and the child to aid and comfort and obey, then it may be the child could successfully maintain an action against the parent for personal injuries. But so long as the parent is under obligation to care for, guide, and control, and the child is under reciprocal obligation to aid and comfort and obey, no such action as this can be maintained.'
"Id., 68 Miss. at 711, 9 So. at 887. (Emphasis added [in Hurst].)
"The first Alabama case addressing the issue of parental immunity, Owens v. Auto Mut. Indemnity Co., 235 Ala. 9, 177 So. 133 (1937), quoted from a New Hampshire case that states a similar reason for the rule:
"`It is declared in Lloyd Dunlap v. Dunlap, 84 N.H. 352, 150 A. 905, 71 A.L.R. 1055 [1930] that the "`disability of a child to sue the parent for an injury negligently inflicted by the latter upon the former while a minor is not absolute, but is imposed for the protection of family control and harmony, and exists only where the suit, or the prospect of a suit, might disturb the family relations.'"' *142 "235 Ala. at 10, 177 So. at 134. (Emphasis added [in Hurst].)
"We reaffirmed the doctrine in Hill v. Giordano, 447 So.2d 164 (Ala.1984) (Jones, J., dissenting), based on the authority of Owens, supra, and held that `any modification or abolition of the parental immunity doctrine should be left to the prerogative of the legislature.' 447 So.2d at 164. However, we also stated three months later in Lloyd v. Service Corporation of Alabama, Inc., 453 So.2d 735 (Ala.1984):
"`While the preferred method for modification of a rule of law is by legislative action, it is clearly within the power of the judiciary, and, at times, appropriate for the judiciary, to change an established rule of law....
"`... [W]here a judicial creation has become outmoded or unjust in application, it is more often appropriate for the judicial body to act to modify the law.'
"(Emphasis added [in Hurst].)
"Because the doctrine was judicially created, it is not exclusively a legislative issue and it may be judicially qualified. Since our decision in Hill to defer to the Legislature on this issue, the Legislature has declined to act in regard to the doctrine, while the incidents of sexual abuse involving children have continued to occur. To leave children who are victims of such wrongful, intentional, heinous acts without a right to redress those wrongs in a civil action is unconscionable, especially where the harm to the family fabric has already occurred through that abuse. Because we see no reason to adhere to the doctrine of parental immunity when the purpose for that immunity is no longer served, as in Melissa's case, we are today creating an exception to the doctrine, limited to sexual abuse cases only.
"In creating this exception for sexual abuse cases, we believe it is unnecessary to spell out a separate body of procedural and substantive rules to govern such cases. Traditional rules of tort law relating to intentional infliction of personal injury are generally sufficient for the governance of such claims and the defenses asserted thereto.
"In the interest of preserving the unqualified right of parents to reasonably discipline their children, we do deem it appropriate, however, to require that the proof of alleged sexually abusive conduct be tested under a `clear and convincing' standard, as opposed to a mere `substantial evidence' standard. Because we are restricting this exception to the general rule to cases involving `sexual abuse,' and requiring a `clear and convincing' standard of proof, we do not perceive of our recognition of this narrow exception as posing an undue risk of limiting the parents' legitimate role in the disciplining of their children."
539 So.2d at 265-66 (last emphasis added).
At this time, some 14 years after Hurst was decided, the Legislature has made no other modification to the doctrine. During that same time, we considered the doctrine once more in Mitchell v. Davis, 598 So.2d 801 (Ala.1992), holding that the doctrine of parental immunity applied to foster parents and recognizing the exception crafted in Hurst. As stated in Hurst, the doctrine was judicially created, and it is therefore subject to judicial modification. But this Court still attaches great importance to the underlying reason for the doctrineto avoid unduly limiting the legitimate interest of parents in rearing and disciplining their children. In Broadwell v. Holmes, 871 S.W.2d 471 (Tenn.1994), the Supreme Court of Tennessee articulated well the importance of this interest:

*143 "The parental right to govern the rearing of a child has been afforded protection under both the federal and state constitutions. This Court has stated, `Tennessee's historically strong protection of parental rights and the reasoning of federal constitutional cases convince us that parental rights constitute a fundamental liberty interest under Article I, Section 8 of the Tennessee Constitution.' Hawk v. Hawk, 855 S.W.2d 573, 579 (Tenn.[1993]); see also Davis v. Davis, 842 S.W.2d 588, 601 (Tenn.1992)[,] cert. denied, 507 U.S. 911, 113 S.Ct. 1259, 122 L.Ed.2d 657 (1993); Bellotti v. Baird, 443 U.S. 622, 638, 99 S.Ct. 3035, 3045, 61 L.Ed.2d 797 (1979) (recognition of parents' right to be free of undue, adverse interference by state); Quilloin v. Walcott, 434 U.S. 246, 255, 98 S.Ct. 549, 554, 54 L.Ed.2d 511 (1978) (recognition that parent-child relationship is constitutionally protected); Wisconsin v. Yoder, 406 U.S. 205, 232, 92 S.Ct. 1526, 1541, 32 L.Ed.2d 15 (1972) (recognition of parents' primary role in child rearing as a `fundamental interest' and `an enduring American tradition'); Prince v. Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944) (recognition that the custody, care and nurture of the child `reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder'). The integrity of the family unit has found protection against arbitrary state interference in the Due Process Clause of the Fourteenth Amendment, Cleveland Board of Education v. LaFleur, 414 U.S. 632, 639-40, 94 S.Ct. 791, 796-97, 39 L.Ed.2d 52 (1974); Roe v. Wade, 410 U.S. 113, 152-53, 93 S.Ct. 705, 726-27, 35 L.Ed.2d 147 (1973); Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923); the equal protection clause of the Fourteenth Amendment, Skinner v. Oklahoma, 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655 (1942); and the Ninth Amendment. [Griswold] v. Connecticut, 381 U.S. 479, 496, 85 S.Ct. 1678, 1688, 14 L.Ed.2d 510 (1965) (Goldberg, J., concurring).
"Courts have expressed a concern that without the imposition of parent-child immunity, juries would feel free to express their disapproval of what they consider to be unusual or inappropriate child rearing practices by awarding damages to children whose parents' conduct was only unconventional. See, e.g., Pedigo v. Rowley, 101 Idaho 201, 205, 610 P.2d 560, 564 (1980); Holodook v. Spencer, [36 N.Y.2d 35,] 364 N.Y.S.2d [859] at 869-71, 324 N.E.2d [338] at 345-46 (N.Y.1974). Courts also properly have found that parents whose `[p]hysical, mental or financial weakness [causes them] to provide what many a reasonable man would consider substandard maintenance, guidance, education and recreation for their children, and in many instances to provide a family home which is not reasonably safe as a place of abode,' should not be liable to the child for these `unintended injuries.' Chaffin v. Chaffin, 239 Or. 374, 397 P.2d 771, 774 (1964) (en banc), overruled by Heino v. Harper, 306 Or. 347, 759 P.2d 253 (1988) (abolishing interspousal immunity); accord Cannon v. Cannon, 287 N.Y. 425, 40 N.E.2d 236, 237-38 (1942), overruled by Gelbman v. Gelbman, 23 N.Y.2d 434, 297 N.Y.S.2d 529, 245 N.E.2d 192, 193 (1969) (abolishing bar to intrafamily lawsuits), but see Holodook v. Spencer, 364 N.Y.S.2d at 865, 324 N.E.2d at 342 (negligent failure to supervise child not recognized as a tort). Such imposition of liability could effectively curtail the exercise of constitutionally guaranteed parental discretion in *144 matters of child rearing. Consequently, it reasonably can be argued that parental immunity that relates to the right and duty to rear children implements a constitutional right. See Hawk v. Hawk, 855 S.W.2d at 579 (recognizing a fundamental constitutional right of parents to care for their children without unwarranted state intervention)."
871 S.W.2d at 475-76.
This Court has been equally loathe to interfere with the parent-child relationship:
"`... So strong is the presumption, that "the care which is prompted by the parental instinct, and responded to by filial affection, is most valuable of all"; and so great is the reluctance of the court to separate a child of tender years from those who according to the ordinary laws of human nature, must feel the greatest affection for it, and take the deepest interest in its welfarethat the parental authority will not be interfered with, except in case of gross misconduct or where, from some other cause, the parent wants either the capacity or the means for the proper nurture and training of the child.'"
Ex parte Sullivan, 407 So.2d 559, 563 (Ala. 1981) (quoting Striplin v. Ware, 36 Ala. 87, 89-90 (1860)). See also R.J.D. v. Vaughan Clinic, P.C., 572 So.2d 1225, 1228 (Ala. 1990).
Given the weight we assign to the sanctity of the parent-child relationship, we decline to follow the example of many of our sister states and wholly abrogate the doctrine of parental immunity. Further, we decline to consider any exception to the doctrine that would permit a claim by an injured child against a parent where the injury was not willful and intentional. In Hurst we held that the exception to the parental-immunity doctrine giving the injured child a right to redress was in response to "wrongful, intentional, heinous acts," 539 So.2d at 266, committed by the parent. Most recently, in Mitchell, supra, we held that the parental-immunity doctrine also protected foster parents as to any claim by a foster child based upon the foster parents' alleged negligence. As the court stated in Broadwell:
"[T]he rights, responsibilities, and privileges of parents in relation to their children are so unique that the ordinary standards of care which regulate conduct between others are not applicable to conduct incident to the particular relationship of parent and child. That relationship includes responsibilities not owed by parents to any persons other than their children; these responsibilities are inseparable from the privileges that parents have in rearing their children which are not recognized in any other relationship."
871 S.W.2d at 475.
In view of this unique and special relationship, we note first that this opinion leaves the doctrine unchanged with respect to the protection afforded a parent from any claim by his or her child based upon unintentional conduct. Further, we consider only the specific circumstances of the case before us and apply our holding only to the situation where it can be shown by clear and convincing evidence that a parent's willful and intentional infliction of injury resulted in the death of his or her child.
As we noted in Hurst, supra, this Court declined to modify the doctrine in Hill, supra, a wrongful-death case in which the father's alleged negligence in piloting a plane resulted in the deaths of his two minor sons. However, the holding in Hurst makes clear that the rationale that supported Hill, i.e., deference to the Legislature, is no longer a dispositive basis for not modifying the judicially created doctrine. *145 Accordingly, we cannot overlook the fact that the wrongful death of a child profoundly impacts the parent-child relationship. Plainly, the death of a child removes the parental interests the doctrine was intended to protect with respect to that child. Certainly, the parent's responsibilities to the child and the child's dependence upon the parent are terminated by the child's death. See, e.g., Floyd v. Abercrombie, 816 So.2d 1051 (Ala.Civ.App. 2001); Anderson v. Loper, 689 So.2d 118 (Ala.Civ.App.1996)(discussing a parent's duties toward his or her unemancipated child). As Justice Jones, dissenting from the majority's opinion in Hill, aptly stated:
"The purpose of the wrongful death statute [Ala.Code 1975, § 6-5-410] is to prevent homicide by wrongful act, omission, or negligence `without respect to personal condition or disability of the person so protected.' Breed v. Atlanta, B. & C.R.R., 241 Ala. 640, 642, 4 So.2d 315, 316 (1941). The parental immunity doctrine has its basis in domestic harmony. Isn't the commission of the tort, in and of itself, disruptive to domestic harmony?"
447 So.2d at 168.
In assessing the balance between the unique nature and critical importance of the parent-child relationship and the right of any victim for redress for a willful or intentional injury, we find the analysis of the Supreme Court of West Virginia instructive. In Courtney v. Courtney, 186 W.Va. 597, 413 S.E.2d 418 (1991), that court considered claims by a mother and her son against her ex-husband and the son's father for a number of intentional assaults. The court stated:
"Courts have recognized that not every physical touching of a child will result in liability. Parents are able to discipline their children by administering reasonable physical punishment. However, when such punishment becomes excessive and results in substantial traumatic injury to the child, liability arises. Several courts have quoted this language from the California Supreme Court in Emery v. Emery, 45 Cal.2d 421, 429-30, 289 P.2d 218, 224 (1955):
"`Since the law imposes on the parent a duty to rear and discipline his child and confers the right to prescribe a course of reasonable conduct for its development, the parent has a wide discretion in the performance of his parental functions, but that discretion does not include the right wilfully to inflict personal injuries beyond the limits of reasonable parental discipline. No sound public policy would be subserved by extending it beyond those limits. While it may seem repugnant to allow a minor to sue his parent, we think it more repugnant to leave a minor child without redress for the damage he has suffered by reason of his parent's wilful or malicious misconduct. A child, like every other individual, has a right to freedom from such injury.'
"See Attwood v. Attwood's Estate, 276 Ark. 230, 633 S.W.2d 366 (1982); Rodebaugh v. Grand Trunk W.R.R. Co., 4 Mich.App. 559, 145 N.W.2d 401 (1966).
"Thus, the general rule is that parental immunity is abrogated where the parent causes injury or death to his or her child from intentional or wilful conduct, but liability does not arise from reasonable corporal punishment for disciplinary purposes."
186 W.Va. at 607, 413 S.E.2d at 428.
Similarly, we recognize an exception to the doctrine of parental immunity in this State for a civil wrongful-death action by the personal representative of a decedent child against the child's parent where the parent willfully and intentionally inflicted *146 the injury that caused the child's death. As in Hurst, supra, "in the interest of preserving the unqualified right of parents to reasonably discipline their children," 539 So.2d at 266, we require that the proof of the alleged willful and intentional nature of the injury that caused the child's death be tested under the clear-and-convincing-evidence standard rather than the substantial-evidence standard.
Accordingly, the judgment of the trial court is affirmed with respect to Newman's wrongful-death claims based on negligence and wantonness; the judgment is reversed with respect to Newman's wrongful-death claim based upon willful and intentional conduct, to the extent that claim implicates a willful and intentional injury, and the cause is remanded for further proceedings consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
JOHNSTONE and WOODALL, JJ., concur.
HOUSTON and HARWOOD, JJ., concur in the result.
LYONS, J., concurs in the result in part and dissents in part.
MOORE, C.J., and SEE, BROWN, and STUART, JJ., dissent.
HARWOOD, Justice (concurring in the result).
I concur in the result. I would prefer that the exception recognized today to the parental-immunity doctrine require only that the parental conduct in question, whether negligent, wanton, or willful and intentional, result in the death of the minor. The doctrine does not preclude an emancipated or adult child from suing a parent in tort, in recognition of the cessation of parent-child reciprocal rights and duties upon a child's emancipation or reaching adulthood. What more final cessation of those rights and duties could there be than that occasioned by death? Accordingly, I would go further than the per curiam opinion and hold that any wrongful-death action predicated on the death of a minor could be brought against his or her parent or parents pursuant to Ala.Code 1975, § 6-5-391.
HOUSTON, J., concurs.
LYONS, Justice (concurring in the result in part and dissenting in part).
I concur in the result in that portion of the per curiam opinion reversing the trial court's judgment so as to permit the action to proceed as to Newman's wrongful-death claim based on willful and intentional conduct. For the reasons set forth below, I dissent from that portion of the per curiam opinion affirming the trial court's judgment dismissing the claims based on negligence and wantonness.
The genesis of the parental-immunity doctrine is an opinion of the Supreme Court of Mississippi in Hewellette v. George, 68 Miss. 703, 9 So. 885 (1891), abrogated on other grounds, Glaskox ex rel. Denton v. Glaskox, 614 So.2d 906 (Miss.1992). The per curiam opinion quotes that portion of Hewellette in which the court observed that if the relationship of parent and child has been finally dissolved, "then it may be the child could successfully maintain an action against the parent for personal injuries." 68 Miss. at 711, 9 So. at 887. Continuing, the Mississippi court noted, "But so long as the parent is under obligation to care for, guide, and control, and the child is under reciprocal obligation to aid and comfort and obey, no such action as this can be maintained." 68 Miss. at 711, 9 So. at 887.
The per curiam opinion states that "the death of the child removes the parental *147 interests the doctrine was intended to protect." 872 So.2d at 145. One might assume that the death of a parent would have the same effect. However, the Mississippi court must have contemplated dissolution of the relationship of parent and child by some mechanism other than death when it made the foregoing observation about when an action by a child could be maintained against the parent. This is so because in the case before the Supreme Court of Mississippi, a minor daughter was attempting to sue the estate of her deceased mother; the court, notwithstanding the absence of an ongoing parent-child relationship, refused to permit the action to proceed. Therefore, the denial of immunity in Hewellette could not have been based upon a public policy against such actions only in instances where there existed the possibility of a viable parent-and-child relationship at the time of the pendency of the action. I conclude that the public policy the Mississippi court was protecting related to the need to shield the parent from liability as to decisions made while the parent was under a duty to protect, care for, and control the child, and the child was under a concomitant duty to aid, comfort, and obey the parent. In this setting, the Mississippi court's standard should be read as follows:
"But so long as the parent is under obligation to care for, guide, and control, and the child is under reciprocal obligation to aid and comfort and obey [at the time of the conduct made the basis of the action ], no such action as this can be maintained."
This Court, in Hurst v. Capitell, 539 So.2d 264 (Ala.1989), embraced an exception to the parental-immunity doctrine in instances where a child can prove by clear and convincing evidence sexual abuse by the parent. The Court noted that "the harm to the family fabric has already occurred through that abuse." 539 So.2d at 266. Could we not just as easily say that harm to the family fabric would occur through a brutal assault not involving sexual abuse? I am not persuaded that "harm to the family fabric" or the termination of the parent-child relationship by death are meaningful bases upon which to chip away at the parental-immunity doctrine.
I prefer to view the rationale for creating the parental-immunity doctrine as a means of protecting the parent in the discharge of his or her duties from second-guessing in subsequent litigation, where hindsight is always crystal clear. Under this view, an after-the-fact analysis of whether there has been "harm to the family fabric" or whether either the parent or the child or both are dead does not offer meaningful justification for reconsidering the wisdom of applying the parental-immunity doctrine to a given situation.
I would prefer to address the prospect for exceptions by formulating a standard sufficient to protect the child when a parent causes injury under circumstances where no reasonable person could expect immunity from the consequences of his or her action, such as where the conduct had been made a felony by the Legislature or is a misdemeanor with respect to conduct directed toward children below an age limit that is irrelevant to the duties imposed by the parent-child relationship. See, e.g., § 13A-6-67, Ala.Code 1975, defining the Class A misdemeanor of second-degree sexual abuse as occurring when a person 19 years old or older subjects another person who is less than 16 years old, but no more than 12 years old, to sexual contact.
Under the above-stated standard, a parent acting in good faith could discipline a child, yet remain secure in the knowledge that only the most egregious acts committed *148 in the course of parenting would expose him or her to the prospect of civil liability in an action brought on behalf of a child. We would thereby recognize the wisdom in permitting a parent to discipline a child without concern over subsequently being required to answer in court for what the child deems excessive corporal punishment. Likewise, negligence not amounting to criminal negligence (§ 13A-2-2(4), Ala.Code 1975) or other breach of duty not amounting to recklessness (§ 13A-2-2(3)) would not become the basis for a civil action, even where the parent-child relationship has been terminated by the child's death. On the other hand, conduct constituting the felonies of manslaughter (§ 13A-6-3, Ala.Code 1975) or criminally negligent homicide (§ 13A-6-4) would not be subject to the defense of parental immunity in a civil action against the parent.
The allegations of the complaint in this action, if proven, would constitute the criminal offense of murder (§ 13A-6-2, Ala.Code 1975). As previously noted, I therefore concur in the result as to the per curiam opinion's reversal of the trial court's judgment dismissing Newman's wrongful-death claim based on willful and intentional conduct. I dissent from that portion of the per curiam opinion affirming the trial court's judgment dismissing the claims alleging negligence and wantonness, because the facts in this case relating to the Coles' negligence or wantonness could be determined to be sufficient to fall under the heading of the felony offenses of either manslaughter or criminally negligent homicide. Under these circumstances, no reasonable person could expect immunity from the consequences of his or her action, and the doctrine of parental immunity should not bar the action.
I agree with the per curiam opinion's insistence upon a standard of proof by clear and convincing evidence in instances where the defense of parental immunity is rejected. I would require the trial court to apply this standard of proof to the elements of the analogous crime in the Alabama Code.
MOORE, Chief Justice (dissenting).
I must dissent from the per curiam opinion because this Court appears to have created a right in the estate of a minor child to maintain a wrongful-death action against his parent. Such a right does not exist under the law of this State, and the maintenance of a tort action by a minor child (or his estate) against a parent does not exist under the common law. This is a tragic case in which the wrongful death of a minor child cries out for redress. But it is the criminal law that has consistently been the source of punishment for any wrong committed by a parent against a child. One of the defendants in this case, John Cole, was found guilty of manslaughter by a jury in criminal court and faces the punishment prescribed by law for his actions.
With regard to the civil liability of a parent for wrongs committed against a minor child, the parental-immunity doctrine first recognized in Owens v. Auto Mutual Indemnity Co., 235 Ala. 9, 177 So. 133 (Ala.1937), has been the precedent of this State. According to Hurst v. Capitell, 539 So.2d 264, 265 (Ala.1989): "The parental immunity doctrine had its genesis in the United States in Hewellette v. George, 68 Miss. 703, 9 So. 885 (1891)." But, in fact, a precursor to the doctrine appeared 36 years before Hewellette when the Supreme Court of Texas held:
"`Honor thy father and mother' is a command not only of the decalogue, but of nature; and suits in which rights can be claimed only through the alleged turpitude of a parent, are not to be encouraged." *149 Stramler v. Coe, 15 Tex. 211, 214-15 (1855). According to a majority of legal commentators who have addressed the subject, Hewellette was the first statement in the United States of the doctrine of parental immunity. But such a position ignores Stramler and Lander v. Seaver, 32 Vt. 114 (1859),[2] which did not use the term "parental immunity," but which certainly described the principle. The principle clearly existed before 1891, even if the words "parental immunity" did not appear in a published opinion.
In 1984, in Hill v. Giordano, 447 So.2d 164 (Ala.1984), the Alabama Supreme Court specifically rejected an attempt to abolish or modify the parental-immunity doctrine that had existed in Alabama since 1937, stating that "any modification or abolition of the parental immunity doctrine should be left to the prerogative of the legislature." 447 So.2d at 164.
However, the per curiam opinion today rejects Hill, stating that "`[b]ecause the doctrine was judicially created, it is not exclusively a legislative issue and it may be judicially qualified,'" 872 So.2d at 142:
"`"While the preferred method for modification of a rule of law is by legislative action, it is clearly within the power of the judiciary, and, at times appropriate for the judiciary, to change an established rule of law....
"`"... [W]here a judicial creation has become outmoded or unjust in application it is more often appropriate for the judicial body to act to modify the law."'"
872 So.2d at 142 (quoting Hurst, 539 So.2d at 266, quoting in turn Lloyd v. Service Corp. of Alabama, Inc., 453 So.2d 735 (Ala. 1984)).
But was the doctrine of parental immunity in fact a judicial creation? Even the per curiam opinion must recognize that for the past 65 years, Owens has been precedent in our law. The rule of precedent was stated clearly by Sir William Blackstone in his Commentaries on the common law:
"[I]t is an established rule to abide by former precedent, where the same points come again in litigation; as well to keep the scale of justice even and steady, and not liable to waiver with every new judge's opinion; as also because the law in that case being solemnly declared and determined, what before was uncertain, and perhaps indifferent, has now become a permanent rule, which it is not in the breast of any subsequent judge to alter or vary from, according to his private sentiments: he being sworn to determine, not according to his own private judgment, but according to the known laws and customs of the land; not delegated to pronounce a new law, but to maintain and expound the old one."
1 Sir William Blackstone, Commentaries 69. The rule of precedent obviously has a valid purpose, i.e., to ensure the orderly rule of law by reliance upon former decisions, *150 solemnly declared and determined. I would submit that the rule in Owens was solemnly declared and determined and that it reflected a fixed principle of the common law, i.e., that the common law did not sanction a tort action by a minor child against his parent,[3] and the doctrine of parental immunity was therefore not judicially created. However, the common law did permit exceptions to precedent when "the former determination is most evidently contrary to reason; much more if it be contrary to the divine law." 1 Blackstone, Commentaries 70. The rule espoused in Owens contradicts neither reason nor the divine law. Simply stated, the per curiam opinion has disregarded precedent in favor of its own private judgment and has judicially created an exception to the doctrine of parental immunity.
The entire rationale of the Court's opinion rests on the premise that the parental-immunity doctrine was judicially created; nevertheless, the Court cannot and does not explain why there is a complete void in the history of the common law of tort actions even being attempted by a minor against a parent. As the Rhode Island Supreme Court stated in 1925:
"That this [parental immunity] has been recognized as expressing the common law is evidenced by the fact that no case of the action of a minor child against his father for tort appears either in the English reports or in any state report down to 1891, although during that period numerous cases appear of criminal proceedings against parents for the abuse of their minor children in circumstances which would permit civil actions for damages if such right of action existed."
Matarese v. Matarese, 47 R.I. 131, 134, 131 A. 198, 199 (1925).
An even earlier court in Washington recognized this absence at common law of a tort action by a minor against his parent:
"At common law it is well established that a minor child cannot sue a parent for a tort. It is said by Cooley on Torts, p. 276, under title of `Wrongs to a Child': `For an injury suffered by the child in that relation, no action will lie at the common law.'"
Roller v. Roller, 37 Wash. 242, 245, 79 P. 788, 789 (1905), disapproved as too broad in Borst v. Borst, 41 Wash.2d 642, 251 P.2d 149 (1952).
The history of the common law dictates that the immunity of a parent from a tort action by his minor child stems not from a judicially created doctrine, but from a well-reasoned and logical understanding that parents were afforded protection from civil actions by their minor children because of parental authority and a corresponding duty to care for, nurture, and administer discipline to those entrusted by God to their care. Parental authority to use force or restraint against a child in the exercise of discipline was recognized under the *151 common law.[4]
"In primitive law, Roman law, and doubtless in early common law, the family is regarded as a unit of government. The head of the family is clothed with broad authority, and he enjoys an immunity in domestic matters similar to that of a sovereign. Historically it is most likely that the explanation of no cause of action for personal injuries is to be found here, both in the husband and wife and in the parent and child cases."
William E. McCurdy, Torts Between Persons in Domestic Relations, 43 Harvard L.Rev. 1030, 1076, 1078 (1929-30).
Sir Frederick Pollock, in the section entitled "Parental and Quasi-parental Authority" of his 1908 treatise on tort law in England, stated:
"Thus much of a private quasi-judicial authority. There are also several kinds of authority in the way of summary force or restraint which the necessities of society require to be exercised by private persons. And such persons are protected in exercise thereof, if they act with good faith and in a reasonable and moderate manner. Parental authority (whether in the hands of a father or guardian, or of a person to whom it is delegated, such as a schoolmaster) is the most obvious and universal instance."
Sir Frederick Pollock, The Law of Torts: A Treatise on the Principles of Obligations Arising from Civil Wrongs in the Common Law, 127 (8th ed.1908). Should a parent act outside the bounds of reasonable discipline he would not be protected from criminal proceedings, but there are no instances to be found under the common law of civil actions in tort filed by a child against a parent.
Section 1-3-1, Ala.Code 1975, expressly adopts the common law of England unless it is specifically altered or repealed by legislative enactment. Because tort litigation between a child and his parent is not acknowledged in the common law and is not authorized by statute, it should not be created by judicial fiat. Yet, the per curiam opinion today carves out an exception to this long-standing rule, without specifying where the line between the growing exceptions[5] and the rule lies.
"[I]f it be once established that a child has a right to sue a parent for a tort, there is no practical line of demarkation which can be drawn, for the same principle which would allow the action in the case of a heinous crime, like the one involved in this case, would allow an action to be brought for any other tort. The principle permitting the action would be the same. The torts would be different only in degree. Hence all the disturbing confusion would be introduced which can be imagined under a system which would allow parents and *152 children to be involved in litigation of this kind."
Roller, 37 Wash. at 244, 79 P. at 789. Beyond the obvious point that this case involves tragic facts in that the father's discipline clearly involved excessive force, the per curiam opinion fails to explain the impetus for making another exception to this long-standing and rational rule.
Owens and the opinions of other states make clear that the principle of parental immunity is logical. The per curiam opinion clearly agrees that the principle is logical because the opinion only modifies the principle; it does not abolish it. Furthermore, the doctrine is not unjust, because the criminal law is available as redress for any acts by a parent that threaten the life or health of his or her child. Finally, other states have written extensively in the judicial opinions of their highest court as to the validity of the parental-immunity doctrine and have explained the multiple rationales behind the rule. See, e.g., Roller, supra; Wick v. Wick, 192 Wis. 260, 260-61, 212 N.W. 787, 787-88 (1927) (action by child against parents for injuries incurred in automobile accident), abrogated by Goller v. White, 20 Wis.2d 402, 122 N.W.2d 193 (1963); Matarese, supra. Because history and logic support the parental-immunity doctrine, I see no reason to modify the rule in this case. Therefore, I dissent.
SEE, Justice, dissenting.
I respectfully dissent for the reason stated by Justice Stuart in her dissent, that Alabama's criminal laws sufficiently punish wrongdoing by a parent toward a child, and also because the public policy of Alabama has long favored the support of family life. In Hurst v. Capitell, 539 So.2d 264, 265 (Ala.1989), citing with approval language from Hewellette v. George, 68 Miss. 703, 9 So. 885 (1891), this Court stated the general rule that "`[t]he peace of ... the families composing society, and a sound public policy, ... forbid to the minor child a right to appear in court in the assertion of a claim to civil redress for personal injuries suffered at the hands of the parent.'"
In Hurst, this Court carved out an exception to that rule for cases involving sexual abuse, because, this Court reasoned, in such a case the parent-child relationship had been irrevocably broken. Where a parent has caused the death of a child, it is true that the relationship between that parent and that child is similarly irrevocably broken; however, that child will not be the one to bring the legal action arising out of the death. The action necessarily will be brought by a representative, most probably the other parent. To encourage suits between surviving family members after the tragic death of a child would serve to further fray the family fabric when it is most susceptible to unraveling. I, therefore, dissent.
BROWN, Justice (dissenting).
I respectfully dissent. With one exceptionwhen a child alleges that he has been sexually abused by a parentthis Court has recognized the doctrine of parental immunity for almost 66 years. Owens v. Auto Mut. Indem. Co., 235 Ala. 9, 177 So. 133 (1937). Given our long-standing adherence to the doctrine, I believe any additional "modification or abolition of the parental immunity doctrine should be left to the prerogative of the legislature." Hill v. Giordano, 447 So.2d 164, 164 (Ala. 1984).
John Cole, the father in this case, has been convicted of criminally negligent homicide, a violation of § 13A-6-4, Ala. Code 1975, for the death of his son Clinton. He has been sentenced to one year's imprisonment and has been ordered to pay a *153 $2,000 fine, a $1,000 assessment to the Crime Victims Compensation Fund, restitution, and court costs. The Court of Criminal Appeals has affirmed his conviction. Cole v. State, (No. CR-01-0911, October 18, 2002) ___ So.2d ____ (Ala.Crim.App.2002)(table).
I believe that, rather than judicially creating a new cause of action, we should continue to punish under the criminal laws of this state a parent whose willful and intentional injury results in the death of his child.
STUART, Justice (dissenting).
I respectfully dissent. I consider it unwise to create the exception to the parental-immunity doctrine advocated by the per curiam opinion in this case. I believe the criminal statutes in this State are adequate to deter a parent from engaging in intentional conduct directed at a child that results in the child's death.
NOTES
[1] Six statesHawaii, Nevada, North Dakota, South Dakota, Utah, and Vermont, and the District of Columbiahave declined to adopt the doctrine. See Rousey v. Rousey, 528 A.2d 416 (D.C.1987); Petersen v. City & County of Honolulu, 51 Haw. 484, 462 P.2d 1007 (1969); Rupert v. Stienne, 90 Nev. 397, 528 P.2d 1013 (1974); Nuelle v. Wells, 154 N.W.2d 364 (N.D.1967); Kloppenburg v. Kloppenburg, 66 S.D. 167, 280 N.W. 206 (1938); Elkington v. Foust, 618 P.2d 37 (Utah 1980); and Wood v. Wood, 135 Vt. 119, 370 A.2d 191 (1977). Eleven statesArizona, California, Minnesota, Missouri, New Mexico, New Hampshire, New York, Ohio, Oregon, Pennsylvania, and South Carolinaadopted the doctrine at some point but subsequently abolished it. See Broadbent v. Broadbent, 184 Ariz. 74, 907 P.2d 43 (1995); Hartman v. Hartman, 821 S.W.2d 852 (Mo.1991); Shearer v. Shearer, 18 Ohio St.3d 94, 480 N.E.2d 388 (1985); Winn v. Gilroy, 296 Or. 718, 681 P.2d 776 (1984); Guess v. Gulf Ins. Co., 96 N.M. 27, 627 P.2d 869 (1981); Anderson v. Stream, 295 N.W.2d 595 (Minn.1980); Elam v. Elam, 275 S.C. 132, 268 S.E.2d 109 (1980); Gibson v. Gibson, 3 Cal.3d 914, 92 Cal. Rtr. 288, 479 P.2d 648 (1971); Falco v. Pados, 444 Pa. 372, 282 A.2d 351 (1971); Gelbman v. Gelbman, 23 N.Y.2d 434, 297 N.Y.S.2d 529, 245 N.E.2d 192 (1969); and Briere v. Briere, 107 N.H. 432, 224 A.2d 588 (1966). The remaining 33 states all retain the doctrine in some form, usually with one or more significant exceptions.
[2] In Lander the Supreme Court of Vermont stated:

"The parent, unquestionably, is answerable only for malice or wicked motives or an evil heart in punishing his child. This great and to some extent irresponsible power of control and correction is invested in the parent by nature and necessity. It springs from the natural relation of parent and child. It is felt rather as a duty than a power. From the intimacy and nature of the relation, and the necessary character of family government, the law suffers no intrusion upon the authority of the parent, and the privacy of domestic life, unless in extreme cases of cruelty and injustice."
32 Vt. at 122. In "extreme cases of cruelty and injustice," the criminal law existed to address the problem.
[3] In a case dealing with a tort action brought by a child against a parent, the North Carolina Supreme Court stated:

"There is no authority at the common law for an action like the present; and while some may not regard the sources of the common law with reverence or with respect, yet, in its truest and most comprehensive sense, the common law is the richest heritage of the race. It is the embodiment of usage and general customs, common to all mankind; it is grounded in natural justice, and it is based upon rules of conduct which have been sanctioned by common consent and approved by the wisdom and experience of the ages."
Small v. Morrison, 185 N.C. 577, 586, 118 S.E. 12, 16 (1923) (action against father on behalf of infant child seeking recovery for injuries to infant allegedly caused by father's negligent operation of automobile).
[4] In an 1846 case in which a father brought an action alleging false arrest, the defendants asserted that they had had the father arrested because they had seen him striking a child. The plaintiff-father responded by pleading that the child was his minor son, still domiciled under the paternal roof and under the care and control of his father, and that he had behaved disrespectfully and had refused to obey his father's lawful commands. Winterburn v. Brooks, 175 Eng. Rep. 7 (1846).

In an 1828 case, Denison v. Cornwell, 17 Serg. & Rawle 374 (Pa.1828), the Pennsylvania Supreme Court stated that a child could not bring an action against a parent for work, labor, and service done. Interestingly, the Court described such an action as a son's "treat[ing] his parent as a stranger." 17 Serg. & Rawle at 378.
[5] In Hurst, this Court opened the door with its first exception to blanket parental immunity in civil cases when it held that the doctrine would no longer apply in cases involving the sexual abuse of a child by a parent.